In the Supreme Court of Georgia

Decided: February 4, 2019

S18A1221.  WAINWRIGHT v. THE STATE.

WARREN, Justice.

Zion Wainwright and his co-defendant Qutravius Palmer were convicted of murder and other crimes in connection with the December 2013 shooting death of Xavier Arnold.[1]  On appeal, Wainwright contends that the trial court erred in denying a requested continuance for his lead counsel to be present for the beginning of the State's direct examination of a key witness, and that his lead trial counsel was ineffective in cross-examining that witness.  Wainwright also asserts that the trial court erred by refusing to allow voir dire of the jurors in panels of twelve and by refusing requests to instruct the jury on accident, justification, and voluntary manslaughter.  Upon our review of the record, we conclude that the aggravated assault that Wainwright was sentenced for should

---

[1] We have already affirmed Palmer's convictions.  *Palmer v. State*, 303 Ga. 810 (814 SE2d 718) (2018).

have been merged, and so we vacate that conviction and sentence. Finding no other reversible error, we otherwise affirm the judgment of the trial court.[2]

1.     Viewed in the light most favorable to the jury's verdict, the evidence presented at trial showed that on December 26, 2013, Xavier Arnold and his girlfriend Xenia Aimes—art students who had been dating for about two years—decided to drive to the Kirkwood neighborhood of Atlanta to take pictures of graffiti near a bike path. On their way to Kirkwood, they picked up

---

[2] The murder was committed on December 26, 2013. On March 20, 2014, Wainwright and Palmer were indicted by a DeKalb County grand jury for malice murder, felony murder predicated on criminal attempt to commit armed robbery, felony murder predicated on aggravated assault, criminal attempt to commit armed robbery, two counts of armed robbery, three counts of aggravated assault, and three counts of possession of a firearm during the commission of a felony. At the conclusion of a joint trial held from May 11-19, 2015, a jury found Wainwright guilty of all counts; Palmer was found not guilty of malice murder, but guilty of all remaining counts. The trial court sentenced Wainwright to life imprisonment for malice murder, and life imprisonment for each armed robbery count (the three life sentences running consecutively), 20 years concurrent for aggravated assault, and 5 years for each of the three firearm counts, running consecutively. The felony-murder verdicts were vacated by operation of law, and the remaining counts were merged for sentencing. Although it appears that the trial court should have separately sentenced Wainwright for criminal attempt to commit armed robbery, "when a merger error benefits a defendant and the State fails to raise it by cross-appeal," we generally do not correct the error, *Dixon v. State*, 302 Ga. 681, 698 (808 SE2d 696) (2017), and decline to do so here. But because the evidence shows that Wainwright's aggravated assault of Ibrahim Sanusi by shooting him was part of the same transaction as Wainwright's armed robbery of Sanusi, the trial court should have merged Count 9 with Count 8. The conviction and 20-year concurrent sentence for Count 9 (aggravated assault) is therefore vacated. See *Thomas v. State*, 289 Ga. 877, 880 (717 SE2d 187) (2011). Wainwright filed a timely motion for new trial on June 12, 2015, which was later amended through new counsel. After a hearing, the trial court denied the amended motion on January 31, 2018. Wainwright filed his notice of appeal on February 27, 2018. The appeal was docketed to the August 2018 term of this Court and submitted for a decision on the briefs.

2

Arnold's close friend, Ibrahim Sanusi, and arrived at Kirkwood around 4:45 p.m. Upon their arrival, Aimes saw two young men down the street. At trial, Aimes testified that she did not initially think much of the men's presence. But as the group of friends walked towards the bike path, Aimes noticed that the two men were following them and getting closer.

The group kept walking straight; the bike path had a fence on one side and MARTA tracks on the other. Near the end of the path, the group stepped to the side to let the men pass, at which point Arnold lit a cigarette. The men did indeed pass the group and disappeared down a "little trail" into the woods. The three friends then decided to turn around and walk back towards their car.

As they turned around, the younger of the two men, Zion Wainwright, who was 14 years old at the time, ran up to them and yelled "[w]hat's up? Why are you acting so hard?" in Arnold's face. The other man, Qutravius Palmer, stood behind Wainwright. Arnold replied that the group of friends was leaving and that Wainwright needed to "chill out," but Wainwright and Palmer escalated the confrontation. Wainwright pulled out a gun and pointed it at Arnold's head while Palmer grabbed Arnold under the arms, immobilizing him. Aimes testified that it seemed as though the two men were working together as a "unit," and it was "clear that when the younger guy pulls out that

3

gun, it is part of the plan for [the older guy] to go behind [Arnold] and restrain him." Arnold fought back; he and Palmer fell to the ground and wrestled as Arnold tried to escape. As the two wrestled, Wainwright turned the gun on Aimes and Sanusi and told Sanusi to empty his pockets, which he did. Sanusi then heard Palmer tell Wainwright, "shoot him," referring to Arnold. As Wainwright began to turn back toward the two men fighting, Sanusi tried to stop Wainwright, either by talking him down, stepping in front of him, or grabbing him.[3] Wainwright then shot Sanusi in the leg and pointed the gun at Arnold.[4] Aimes ran in front of the gun, screaming, while Wainwright screamed at her repeatedly to move. Aimes screamed "I'm not moving!" to which Wainwright replied "move, hoe [sic]" before pushing Aimes out of the way. Sanusi again heard Palmer tell Wainwright to "shoot him." As Arnold began to stand up, Wainwright shot him in the back of the head. According to a neighbor who saw the shooting from her back deck, Wainwright "bowed up" his chest and did a "dance" like he was proud of what he had just done. Palmer then snatched Aimes's phone away from her, and Palmer and Wainwright took

---

[3] There was conflicting testimony at trial about what Sanusi did at this point.

[4] Sanusi survived the gunshot wound to his leg, but died before trial in an unrelated drowning accident. His statements were introduced through multiple close friends under a hearsay exception.

4

off together in the same direction. Arnold was taken to Grady Hospital but died of his injury shortly after arrival.

Aimes picked Wainwright out of a photographic lineup and identified him at trial. The evidence also showed that phone numbers registered to Palmer and to Wainwright's mother (which was the phone number Wainwright used) were in contact with each other around the time of the shooting, and showed pings off cell towers near the location of the shooting. A woman familiar with both defendants also informed law enforcement that shortly after the shooting, she saw Palmer and Wainwright near the bike trail and heard them discussing the incident—including Wainwright stating that he shot a male because Palmer told him to.

Although Wainwright has not challenged the sufficiency of the evidence, it is our customary practice to review the sufficiency of the evidence in murder cases, and we have done so here. After reviewing the record of Wainwright's trial, we conclude that the evidence presented against him was sufficient to authorize a rational jury to find beyond a reasonable doubt that Wainwright was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

5

2.      Wainwright contends that the trial court erred by denying a request for continuance that his second-chair counsel, Scott Fortas, made at trial. Specifically, Wainwright's lead counsel, Ricky Morris, had not yet arrived to court on the first morning that evidence was presented at trial. The judge asked if anyone knew when Morris would arrive, and then asked Fortas if he had heard from Morris. The following exchange then occurred:

Mr. Fortas:      No, your honor. I can just -- 20 seconds.

The Court:      No, we need to get started. You know, Mr. Morris is -- knows that we're supposed to start at 8:30. It is 8:50. All the jurors are here and I need to get started.

You know, I had this problem at calendar calls just trying to get Mr. Morris in court on time. I think Mr. Johnson and Mr. Clegg have been here numerous times for nine o'clock calendar calls. Mr. Morris doesn't appear until 11:00 or 11:30 or after lunch. So we need to get started.

. . .

Mr. Fortas:      Well, I understand that. But I mean, it really -- it just has to do with the fact that, you know, with the witnesses the way that we (inaudible) . . . . These are Mr. Morris's witnesses and –

The Court:      I don't know that. Mr. Morris has chosen not to tell me anything about his trial strategy and that's his prerogative. But he has you here as co-counsel and we need to get started.

6

. . .

Mr. Fortas:      If I can just have -- if I can have 15 seconds.

The Court:       All right.  Well, we'll have -- we will have the jury waiting for you.  We will not call witnesses out.  But it takes them a couple, 15 seconds to get their coffee and notepads.

And make sure they have the badges on and have them sit in the jury box.

Mr. Fortas:      Thank you, Judge.

Fortas left the courtroom, the jury was seated, and shortly thereafter, Fortas re-entered the courtroom.  At the court's request, the State then called its first witness and the presentation of evidence began without Fortas making any additional request or comment about Morris.  Nor did Fortas ask for a continuance. Morris arrived in court approximately an hour later, roughly three-quarters of the way through the State's direct examination of Aimes, its second witness.  After hearing the remainder of Aimes's direct examination, Morris cross-examined her.

Wainwright concedes on appeal that the first witness, Arnold's mother, was "relatively unimportant," but argues that Aimes—the only surviving victim—"was the most important witness in the case," and complains that the

7

trial court's decision resulted in Morris cross-examining Aimes without hearing most of her direct examination. Wainwright argues that the trial court abused its discretion by denying Fortas's request to wait for Morris before witness testimony began, which—according to Wainwright—happened after the trial judge interrupted Fortas and failed to consider the relevant facts and circumstances surrounding Fortas's request. The State counters that the only request that Fortas actually made was for time to contact Morris, and that the court granted that request even though it initially stated that it would not. The State further contends that Fortas, a competent co-counsel, represented Wainwright during the State's presentation of the first two witnesses and made no further objection and no request for continuance.

"All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require. . . ." OCGA § 17-8-22. "Without a clear showing of abuse of this broad discretion, this Court will not disturb the trial court's decision to deny a motion for continuance." *Phoenix v. State*, __ Ga. __, __ (__ SE2d __, S18A1439, 2008 WL 6438440, at *2, 2018 Ga. LEXIS 793) (2018). And to be entitled to a new trial based upon the denial of his motion for continuance, Wainwright "'has the burden to show that he was

8

harmed by that denial.'" *Phoenix*, __ Ga. at __ (quoting *Geiger v. State*, 295 Ga. 648, 651 (763 SE2d 453) (2014)).

Here, the trial transcript shows that after Fortas asked to delay the presentation of evidence to contact Morris, the trial court agreed to delay proceedings for a short period of time. But we need not determine what exactly Fortas did during that delay, or settle the parties' dispute about whether Fortas's request merely was for time to contact Morris to determine his whereabouts, or whether Fortas was requesting a continuance to ensure that Morris was present when the State's first witness began testifying. That is because in either instance, Wainwright has not met his burden of showing that he was harmed. A review of the record shows that Fortas was in court and representing Wainwright when the State presented its first and second witnesses, and Wainwright does not allege any specific errors in Fortas's representation of Wainwright in Morris's stead. Indeed, there is no inherent violation of a defendant's constitutional right to counsel when an associate of lead counsel represents the defendant. See *Cox v. State*, 279 Ga. 223, 226 (610 SE2d 521) (2005).

Similarly, Wainwright does not point to any specific errors that Morris committed in his cross-examination of Aimes, arguing instead that he

9

necessarily must have been harmed by Morris cross-examining Aimes since Morris was not present for much of Aimes's direct examination. But mere speculation and conjecture that harm occurred is not enough to show harmful error. *Phoenix*, __ Ga. at __; see also *Geiger*, 295 Ga. at 651-652. Because Wainwright offers only speculation that he was harmed, this enumeration of error fails.

3.    Related to his contention that the trial court erred in denying Wainwright's request for continuance, Wainwright also contends that Morris rendered ineffective assistance by cross-examining Aimes after being absent for the majority of the State's direct examination of her.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show not only that counsel's performance was deficient, but also that the deficient performance prejudiced the defendant—in other words, a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). Wainwright, however, argues that the circumstances of his case were so egregious that prejudice should be presumed because he was effectively denied effective

10

assistance of counsel at a critical stage of his trial. See *United States v. Cronic*, 466 U.S. 648, 659 (104 SCt 2039, 80 LE2d 657) (1984). We disagree.

*Cronic*'s "constructive denial of counsel" exception to the general *Strickland* standard is a "narrow" one that applies only when "'there was a breakdown in the adversarial process,' such that 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Charleston v. State*, 292 Ga. 678, 682-683 (743 SE2d 1) (2013) (quoting *Cronic*, 466 U.S. at 659, 662). Moreover, the *Cronic* exception requires an "'attorney's failure [to] be complete' and must occur throughout the proceeding and not merely at specific points." *Charleston*, 292 Ga. at 682-683 (quoting *Turpin v. Curtis*, 278 Ga. 698, 699 (606 SE2d 244) (2004)). Given that co-counsel was present throughout, Wainwright's contention that Morris's cross-examination of a single—albeit important—witness after missing most of her direct examination "does not meet this stringent standard," and therefore *Strickland*'s two-part test remains the appropriate standard to evaluate Wainwright's claims. Id. at 683.

Here, Morris testified at the motion for new trial hearing that he prepared for Aimes's cross-examination, and the record shows that he conducted a cross-examination that included (among other things) questioning Aimes about

11

her previous out-of-court statements, which he used to impeach her, and about the State's previously admitted exhibits. Wainwright does not point to any specific problems with Morris's cross-examination or ways that Morris should have questioned Aimes differently; instead, he speculates that Morris's absence during Aimes's direct testimony must have prejudiced Wainwright. As a result, Wainwright has not established a reasonable probability that the result of his trial would have been different absent Morris's alleged deficiencies. See *Baker v. State*, 293 Ga. 811, 815 (750 SE2d 137) (2013) (mere speculation that counsel failed to properly cross-examine witness is not enough to show prejudice on ineffective assistance of counsel claim). And "[i]f an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010). Wainwright's claim of ineffective assistance of counsel therefore fails.[5]

---

[5] We note that Morris was disbarred by order of this Court on January 29, 2018, after Wainwright's trial, for issues unrelated to Morris's representation of Wainwright. *In the Matter of Morris*, 302 Ga. 862 (809 SE2d 799) (2018). The fact that "counsel was subsequently disbarred does not itself show ineffective assistance in [a] particular case." *Anthony v. State*, 302 Ga. 546, 555 (807 SE2d 891) (2017); see also *Simmons v. State*, 291 Ga. 705, 713 (733 SE2d 280) (2012).

4. Wainwright next claims that the trial court erred by refusing his request to voir dire individual jurors in panels of 12 at a time. But any error in this respect was harmless.

"In the examination of individual jurors . . . it shall be the duty of the court, upon a request of either party, to place the jurors in the jury box in panels of 12 at a time, so as to facilitate their examination by counsel." OCGA § 15-12-131. In accordance with that rule, we have held that "upon a party's request, the trial court is required to put the jurors in the jury box in groups of 12 for examination of individual jurors because the statute does not provide for the exercise of judicial discretion in this matter." *Hammond v. State*, 273 Ga. 442, 444 (542 SE2d 498) (2001). Error in this respect, however, will not warrant reversal if the defendant is not harmed by it. *Raven v. State*, 256 Ga. 366, 367 (349 SE2d 383) (1986). And a trial court's error in denying a defendant's request to place the jury in panels of 12 for individual questioning has been held harmless when the evidence of guilt in the case was overwhelming. See, e.g., *Jones v. State*, 217 Ga. App. 722, 723 (458 SE2d 894) (1995); *Mathis v. State*, 176 Ga. App. 362 (336 SE2d 299) (1985).

We start by noting that at the outset of voir dire, Wainwright did request "that there be 12 in each panel that we voir dire." The trial court denied that

request, indicating that jurors would be placed in the jury box in panels of 14 at a time. The court then proceeded by posing general voir dire questions to the 48 jurors en masse; allowing the parties to then ask additional, general voir dire questions en masse (with jurors raising their hands to indicate affirmative responses, so that the parties could follow up with them during individual voir dire); and then permitting the parties to examine individual jurors, one by one, while seated in the jury box in panels. And as it said it would, the court placed jurors in the jury box for individual examination in panels of 14, even after Wainwright requested that 12 be in each panel.

It is not entirely clear whether Wainwright's request, which he made before general voir dire began, was that both general and individual voir dire questions be propounded to the jurors while they were seated in the jury box in panels of 12. But even assuming that the request included individual voir dire—a request that the court should have granted under OCGA § 15-12-131—we conclude that under the circumstances of this case, the inclusion of two additional jurors in the panels during individual voir dire did not harm Wainwright. Though Wainwright asserts generalized harm by contending that Morris had "unusual difficulty . . . managing voir dire," Wainwright does not show how those alleged difficulties were attributable to the two additional

14

jurors in each panel. Moreover, the evidence of Wainwright's guilt was strong: among other things, the surviving victim identified Wainwright—in a photographic lineup and again at trial—as the person who shot Sanusi and shot and killed Arnold; another witness, who was familiar with both defendants, told law enforcement that she saw Wainwright and Palmer running from the scene shortly after the murder and heard Wainwright admit to shooting a male at Palmer's request; and cell-phone records confirmed that Wainwright was in the area at the time of the murder. Given the lack of record evidence showing that Wainwright suffered harm, and the strength of the evidence against him, any error in the court's decision to place the jury in panels of 14 during voir dire is harmless, and Wainwright's claim fails.

5. Wainwright also contends that the trial court erred by refusing his requests to instruct the jury on accident, justification, and voluntary manslaughter. We start by recognizing that "[t]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge," *Hicks v. State*, 287 Ga. 260, 262 (695 SE2d 195) (2010), and address each contention under that standard.

(a) As to accident, Wainwright argues that the testimony of one of Sanusi's friends supported a jury charge on accident. That friend testified

15

that "[Sanusi] grab[bed] [Wainwright] from behind, kind of like tried to restrain him. And that's when, like, [Sanusi] got shot. So I'm not sure if, like, the -- that incident, like if it's just, like, the trigger got pulled or whatever. But he got shot, so he was down." We disagree.

"A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." OCGA § 16-2-2. Conversely, when the evidence shows that a defendant acted with criminal intent, was engaged in a criminal scheme, or was criminally negligent, then the affirmative defense of accident is unavailable and a jury charge on accident is not warranted. See *Mills v. State*, 287 Ga. 828, 832 (700 SE2d 544) (2010).

Here, the evidence showed that Wainwright and Palmer rushed the victims, and—after yelling in Arnold's face—Wainwright pointed a gun at Arnold's face while Palmer grabbed Arnold from behind. As Palmer and Arnold then struggled, Wainwright turned his gun on Sanusi and Aimes and demanded that Sanusi empty his pockets, which Sanusi did. And when Palmer told Wainwright to shoot Arnold, Wainwright turned his gun back on Arnold, prompting Sanusi to try to stop Wainwright. Even assuming that Sanusi grabbed Wainwright at this time, causing the gun to accidentally discharge and

16

shoot Sanusi in the leg, Wainwright was not entitled to avail himself of the affirmative defense of accident.  Because the evidence presented at trial shows that Wainwright intended to commit, and indeed was in the midst of committing, armed robbery and aggravated assault with a firearm when this alleged accidental discharge occurred, the trial court properly denied Wainwright's request for a jury charge on accident.

(b)  Wainwright next argues that because some evidence indicated that Arnold may have been starting to overpower Palmer during their fight—which occurred after Palmer grabbed Arnold from behind as Wainwright held a gun to his face—it was error not to charge the jury on justification of defense of self or others.  That is not so.

Although a person is justified in using deadly force if he "reasonably believes that such force is necessary to prevent death or great bodily injury to himself or . . . a third person or to prevent the commission of a forcible felony," OCGA § 16-3-21 (a), "[a] person is not justified in using" such force if he:

. . .

> (2) Is attempting to commit, committing, or fleeing the commission or attempted commission of a felony; or

17

(3) Was the aggressor or was engaged in combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force.

OCGA § 16-3-21 (b). Here, the evidence shows Wainwright initiated the assault and robbery of the victims by aggressively approaching Arnold and pointing a gun in his face before demanding Sanusi to empty his pockets at gunpoint. Under these circumstances, Wainwright was not entitled to a jury charge on justification. See, e.g., *Powers v. State*, 297 Ga. 345, 349 (773 SE2d 751) (2015) ("[A] defendant is not entitled to a jury instruction on justification when the evidence is that the supposedly justified party was the aggressor."); *Brunson v. State*, 293 Ga. 226, 227-228 (744 SE2d 695) (2013) (defendant not entitled to self-defense charge where victim initiated struggle because defendant threatened him with a firearm). "Indeed, it would turn the law on its head to allow an armed aggressor, who confronts an unarmed nonthreatening victim, to claim self-defense when the victim is shot during the victim's struggle to disarm the aggressor." *Kilpatrick v. State*, 252 Ga. App. 900, 904 (557 SE2d 460) (2001).

(c) Finally, Wainwright asserts that a jury charge on voluntary manslaughter was warranted because the jury could have found that everyone

18

involved in the incident—including the three victims—chose to engage in mutual combat, which "may authorize the jury to find the defendant guilty of voluntary manslaughter." *Berrian v. State*, 297 Ga. 740, 742 (778 SE2d 165) (2015). We again disagree.

The evidence shows that the victims tried to avoid a confrontation with Wainwright and Palmer, and that during Wainwright's and Palmer's assault of the victims, Arnold and Sanusi attempted to defend themselves or others; there is no evidence to support a finding of mutual combat. See *Watson v. State*, 298 Ga. 348, 350 (782 SE2d 18) (2016) ("Reluctance, or fighting to repel an unprovoked attack, is self-defense, . . . and should not be confused with mutual combat.") (citation and punctuation omitted). Wainwright's final enumeration of error also fails.

Judgment affirmed in part and vacated in part. All the Justices concur.