NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 20, 2024

S24A1374.  BENNETT v. THE STATE.

BOGGS, Chief Justice.

Appellant DeMarvin Ladele Bennett challenges his convictions for malice murder and other crimes in connection with the shooting death of 73-year-old Jack Hough. Appellant contends that the evidence was constitutionally insufficient to support his conviction for malice murder, that the trial court abused its discretion by admitting evidence of his 2012 guilty plea conviction for robbery, that the trial court erred by instructing the jury that it could consider that 2012 conviction for the purpose of showing intent, and that the trial court erred by failing to give a jury instruction on accident. For the reasons explained below, we affirm.[1]

---

[1] The crimes occurred on February 7, 2019. On February 26, 2019, a Hall County grand jury indicted Appellant for malice murder (Count 1), four counts

1. The evidence presented at trial showed the following.[2] On the evening of February 7, 2019, Jack, who was 73 years old, went with his wife Gail to a pharmacy in Gainesville so she could pick up her prescription. Security camera footage from inside the pharmacy showed Gail walking into the store at 7:47 p.m. Jack remained in the driver's seat of his black Mercedes-Benz. Around the time Gail entered the pharmacy, witnesses in the parking lot noticed a tall,

of felony murder (Counts 2-5), criminal attempt to commit robbery (Count 6), robbery against a person 65 years of age or older (Count 7), possession of a firearm by a First Offender probationer (Count 8), aggravated assault with a deadly weapon against a person 65 years or older (Count 9), and possession of a firearm during the commission of a felony (Count 10). At a trial from April 26 to 29, 2021, the jury found Appellant guilty of all counts except robbery and felony murder predicated on robbery. The trial court sentenced Appellant to serve life in prison with the possibility of parole for malice murder; ten years imprisonment, consecutive to Count 1, for criminal attempt to commit robbery; ten years on probation, consecutive to Count 6, for possession of a firearm by a First Offender probationer; and five years on probation, consecutive to Count 8, for possession of a firearm during the commission of a felony. The felony murder guilty verdicts were vacated by operation of law, and the aggravated assault count merged. On May 10, 2021, Appellant filed a motion for new trial, which he amended with new counsel on January 22, 2023. After evidentiary hearings on January 23, 2023, and May 22, 2023, Appellant filed a supplemental amended motion for new trial on June 5, 2023, and the trial court entered an order denying the motion on July 20, 2023. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the August 2024 term and submitted for a decision on the briefs.

[2] Because this case involves the evaluation of the harm caused by the trial court's error in admitting other-acts evidence, we set out the evidence in detail, rather than recounting it in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 n.2 (882 SE2d 227) (2022).

slender man wearing a dark-colored sweatsuit with a hood and a red hat. The lower half of his face was covered with a medical face mask with a mouth design on it. Witnesses found him "suspicious" because he was wearing a full sweatsuit on an unusually warm day, wearing a medical mask,[3] jumping up and down, staring into cars, and pacing around the parking lot.

Around 7:50 p.m., a man was jogging near the pharmacy when he heard a "pop." Immediately after he heard the sound, he saw a man — matching the description given by witnesses in the parking lot — running up a hill and passing by him, heading away from the pharmacy. The jogger went down the hill to the pharmacy parking lot to see what the noise was. Once he got there, he saw Jack leaning halfway out of the open car door, bleeding, and struggling to breathe. After realizing Jack had been shot, the jogger alerted another person in the parking lot and that person called 911 at 7:53 p.m.

Officers from the Gainesville Police Department responded to

---

[3] The incident occurred prior to the COVID-19 pandemic, so witnesses found it strange to see someone in a medical face mask.

the scene around 8:00 p.m. When they arrived, EMS was already treating Jack, whom officers believed had been shot at least twice in the chest area. After EMS transported Jack to the hospital, where he later died, officers began looking inside Jack's car, without going in it. They noticed a spent shell casing and a cell phone on the floorboard of the driver's side, handprints on the partially rolled down driver's side window, and a holstered gun in the door panel of the driver's side.

The lead investigators arrived on the scene shortly after responding officers. Investigators spoke with witnesses and dispatched K-9 units around the area. Based on descriptions given by multiple witnesses, investigators knew they were looking "for a tall, slender, black male," who was possibly wearing "dark jeans or a [black coat,] . . . a red beanie, a mask with a . . . [m]outh on it," and black shoes with white bottoms. Footage from cameras inside the pharmacy showed a man matching this description walking past the entrance of the store at 7:49 p.m., but the footage did not show his

face.[4] Witnesses also said that the man ran in the direction of a restaurant north of the pharmacy. While the man was seen prior to the shooting, no one saw him interact with or shoot Jack.

After obtaining a search warrant for Jack's car, investigators determined that the gun in the driver's side door panel was a Remington .380 pistol. Jack's family told investigators that he kept this gun in his car. Gail testified that he also kept a gun in the center console of the car. However, when the vehicle was searched, no weapon or holster was found in the console. Moreover, investigators testified that when they arrived on the scene, the center console was closed. "There [were] blood drops both on the portion of the console that's stationary and then the part that opens," suggesting to investigators that the center console was closed when Jack was bleeding in the car. Other evidence recovered from Jack's car included a bullet that was lodged in the driver's seat, and Jack's wallet, which included various bank cards, a $500 American Express gift card, and a money clip containing $601.

---

[4] There were no exterior cameras at the pharmacy.

The following day, Friday, February 8, investigators had Jack's car processed and searched a second time. Two sets of palm prints and fingerprints were identified and lifted off the driver's side window. The palm prints were on the outside of the window and the fingerprints were on the inside. Both sets of prints were of a left hand. Investigators believed whoever grabbed the window "grab[ed] [it] and then . . . reposition[ed]" their left hand. The prints were searched in the local Gainesville database, but the search did not produce any results. The prints were then sent to the Forsyth County Sheriff's Office, which has a statewide database for prints. That search narrowed down a list of candidates for each set of prints. Appellant was the only person on both lists, as well as the only person that lived in Georgia on either list. At this point, Appellant became a person of interest in Jack's killing. Investigators also learned that Appellant was on probation for a 2012 robbery conviction.

That same day, investigators searched for Appellant on Facebook. Appellant had a public account, so they had unrestricted

access to his profile. While reviewing Appellant's profile, investigators recognized an apartment building in the background of two of Appellant's photos, which were both posted two days before the shooting. The building was Ridgecrest Apartments in Gainesville. In driving distance, Ridgecrest is approximately eight-tenths of a mile from the pharmacy where Jack was killed.

Investigators wanted to confirm that the prints found on the window belonged to Appellant. To do so, they requested a faxed copy of Appellant's prints from the State Probation Office for comparison. However, the faxed copies were of insufficient quality, prompting investigators to obtain Appellant's original print cards from the Clayton County Sheriff's Office. From comparing the print cards with the prints found on the window, investigators confirmed that the window prints belonged to Appellant.

Investigators also spoke with Appellant's probation officer, who provided them with Appellant's phone number and informed them that he had been living in a storage facility in East Point. By "track[ing]" his cell phone number, investigators determined that

7

Appellant was in Gainesville the night Jack was shot and narrowed down his current location at that time. After obtaining an arrest warrant, investigators went to the storage facility and arrested Appellant early Sunday morning.

Investigators interviewed Appellant in their vehicle while parked at the storage facility, after Appellant was given warnings required by *Miranda*[5] and agreed to speak with them. Throughout the interview, which was audio-recorded and played for the jury at trial, Appellant made several inconsistent statements. Initially, Appellant claimed that he had never been to Gainesville, but then later said he had been in Gainesville visiting his best friend at Ridgecrest a week before the shooting. Next, Appellant claimed that the night of the shooting he went to the pharmacy where Jack was killed to get a movie, and Jack called him a racial slur, prompting Appellant to approach Jack's car. He later recanted this statement and claimed that Jack never said anything to him, and that because Appellant needed work boots he was walking around the pharmacy

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

parking lot to see whom he could ask for money. Appellant told investigators that Jack was already at the pharmacy when he arrived, parked to the left of the pharmacy entrance. Appellant first saw Jack when Appellant was waiting on the "darkest [lit] side" of the pharmacy parking lot, to the left of the pharmacy entrance and Jack's car. Appellant thought he could get money from Jack because Appellant believed Jack was the "only person out there." Appellant also said he was wearing a dark-colored hooded sweatsuit, a medical mask with a mouth design on it, and a red hat. He claimed he wore a sweatsuit and medical mask because it was cold outside and he did not want to get sick.

When asked if he brought a gun to the pharmacy, he initially responded "hell [no]." However, he later claimed that he brought a .380 caliber pistol, which was hidden in his pants, that he purchased from someone in Gainesville. Appellant said he did not shoot Jack "off top," meaning he did not shoot Jack as soon as he approached Jack's car, but rather said, "Don't move, give me $25." At that point, he said, Jack began reaching toward his center console. In one part

9

of the interview, Appellant said that once Jack started reaching, Appellant pulled the .380 caliber pistol from his pants and shot Jack once.[6] However, at another point in the interview, Appellant said Jack had a gun and "tried to shoot [Appellant]," so Appellant "snatche[d] the gun" out of Jack's hand because "[Jack] did not have a good grip" on it, and "hit [Jack] twice, 'boom, boom,' in the torso."

Appellant told investigators that after shooting Jack, Appellant ran toward Ridgecrest, without taking anything from the car. After initially saying he burned all the evidence and gave the gun back to the person he purchased it from, Appellant later admitted that he put the clothes and shoes he was wearing and the murder weapon in a storm drain at Ridgecrest. He said the clothes and shoes would be in separate plastic grocery bags and the gun would be wrapped in a red T-shirt. Investigators found the evidence in the manner described by Appellant. The gun found in the storm

---

[6] In response to Appellant saying he shot Jack once, investigators asked Appellant whether he "thought it was a possibility that he shot [twice]." Appellant responded that he thought it could have been two shots, but that it was "quick as hell."

drain, which was determined to be the murder weapon, was an Accu-Tek .380 pistol.

Throughout the interview, Appellant made several incriminating statements, such as "just take me to jail" and "give me a life sentence, at least thirty years."

Forensic experts testified that the markings on the spent shell casing found on the floorboard of Jack's car, which had been fired from the Accu-Tek, indicated that the same casing had previously been loaded into the Remington handgun found in the driver's door panel. The fact that the casing had been "cross-loaded" between the two guns suggested to investigators that the Accu-Tek belonged to Jack. Forensic experts also testified that the Accu-Tek's trigger required approximately nine pounds of pressure to pull, and during test fires, they were able to pull the trigger with ease.

The medical examiner testified that Jack died because of two gunshot wounds. There was no way to determine which wound occurred first, but she testified that one wound was "fairly high on the left side of his chest. It's . . . roughly two and a half inches away

from the midline here in the front, so it would be a little bit below the collarbone." The bullet did not exit his body, stopping on the upper right side of his back. The other shot entered his right arm and exited the back portion of the arm. Based on the entry of the bullets, Jack was likely leaning away from the driver's side window when he was shot.

2. When properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of malice murder.[7] See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Anthony v. State*, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense."); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the

---

[7] Appellant does not challenge the constitutional sufficiency of the evidence supporting his other convictions.

credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (cleaned up)).

Here, Appellant admitted that he walked up to Jack's car and tried to rob him, but when Jack began to reach for a gun in his center console, Appellant took the gun and shot Jack with it. See *Davis v. State,* 306 Ga. 594, 597 (832 SE2d 341) (2019) (concluding evidence was constitutionally sufficient to support the defendant's conviction for malice murder where the evidence showed that a "robbery went badly," and he admitted to others that he shot the victim). Additionally, although the jury was charged on self-defense, it was authorized to disbelieve Appellant's claim that he feared for his life, especially when he was the initial aggressor and demanded money from Jack by telling him "Don't move, give me $25." See *Carter v. State,* 310 Ga. 559, 562 (852 SE2d 542) (2020) (holding that evidence was constitutionally sufficient to authorize a conviction for malice murder where, even if the victim had shot first, the defendant "was the initial aggressor in the confrontation . . . , shouting 'Don't move'"). See also *Mosby v. State,* 300 Ga. 450, 452 (796 SE2d 277)

13

(2017) ("An aggressor is not entitled to a finding of justification.").

Further, Appellant asserts that the encounter between him and Jack only lasted a few seconds, so there was not enough time for Appellant to have formed the intent to kill Jack. However, contrary to Appellant's contention, "the malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." *Scoggins v. State*, 317 Ga. 832, 836 (896 SE2d 476) (2023) (cleaned up). Here, there was evidence of malice. As evidenced by the entry path of the bullets, Jack was leaning away from the driver's side window when he was shot, which authorized the jury to infer that he was trying to get away from Appellant. See *Moran v. State*, 302 Ga. 162, 164 (805 SE2d 856) (2017) (concluding there was evidence of malice where, among other things, the defendant admitted to shooting the victim as the victim was trying to escape). The evidence also showed that Appellant gave investigators an inconsistent version of events when asked about his involvement in Jack's killing, fled the scene, and hid evidence. See *Blackshear v. State*, 309 Ga. 479, 482-484 (847 SE2d 317) (2020)

14

(concluding that the evidence was constitutionally sufficient to authorize the defendant's malice murder conviction where forensic evidence linked the defendant to the victim and the crime scene and the defendant gave inconsistent statements to police about his involvement in the victim's death); *Frazier v. State*, 309 Ga. 219, 224-225 (845 SE2d 579) (2020) (evidence was constitutionally sufficient to establish malice murder where, among other things, the defendant fled the scene after shooting the victim); *Kemp v. State*, 303 Ga. 385, 389 (810 SE2d 515) (2018) (concluding the evidence was constitutionally sufficient to authorize a conviction for malice murder where, among other things, the defendant and his accomplices attempted to get rid of evidence of the crime). Therefore, the evidence was constitutionally sufficient to support Appellant's conviction for malice murder.

3. Appellant next contends that the trial court abused its discretion by admitting his 2012 guilty plea for robbery, which the State offered for the purpose of showing intent with respect to the

15

charge of criminal attempt to commit robbery.[8] Correspondingly, Appellant asserts that the trial court erred by instructing the jury it could consider his prior conviction for intent purposes. We conclude that any error in both respects was harmless.[9]

Appellant argues that the probative value of admitting his previous conviction under OCGA § 24-4-404 (b) ("Rule 404 (b)")[10] was outweighed by its prejudicial effect. However, we apply a harmless

---

[8] OCGA § 16-4-1 provides that "[a] person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." Additionally, OCGA § 16-8-40 (a) provides, in relevant part, that

> A person commits the offense of robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another: . . .
>
> > (2) By intimidation, by the use of threat or coercion, or by placing such person in fear of immediate serious bodily injury to himself or to another; . . .

[9] Appellant also contends that the trial court abused its discretion by refusing to accept his offer to stipulate to the fact of his sentence for the prior offense, which the State did not accept, and instead admitting the full record of his prior conviction. However, because we conclude below that any error in admitting the other-acts evidence was harmless, we need not address whether the trial court abused its discretion by refusing to accept the stipulation.

[10] Rule 404 (b) provides that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith."

error review to erroneous evidentiary rulings. See *Allen v. State*, 310 Ga. 411, 415 (851 SE2d 541) (2020). "For a nonconstitutional ruling [on the admission of Rule 404 (b) evidence], the test for determining harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (cleaned up). In determining whether an error in admitting Rule 404 (b) evidence was harmless, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Moore v. State*, 307 Ga. 290, 293 (835 SE2d 610) (2019).

At trial, the State presented evidence showing that on October 14, 2011, Christian Martinez was walking home from work around 4:30 p.m. when he heard a clicking noise and turned around and saw "a couple of guys standing behind [him], and one had a gun[.] They told [him] to give them everything in [his] pockets." One of the robbers was Appellant, who, along with his accomplices, stole Martinez's money, phone, shoes, and hat. After being arrested, Appellant was subsequently indicted for armed robbery. However, in 2012, he pled guilty to a reduced charge of robbery and was

17

sentenced as a first offender to 15 years, with the first seven to be served in prison and the remainer to be served on probation. The trial court, over Appellant's objection, instructed the jury that it could consider the prior conviction for the limited purpose of showing Appellant's intent to commit a robbery in this case.

Without deciding whether the trial court abused its discretion in admitting the evidence of Appellant's prior conviction to establish intent, or erred in instructing the jury that it could consider the prior conviction for that purpose, any error in both respects was harmless given the strong evidence of Appellant's intent to commit robbery.

Here, the evidence of Appellant's intent to rob was strong. Appellant admitted during his interview with investigators that while waiting in the "darkest [lit] part" of the pharmacy parking lot, he chose to approach Jack for money because he believed Jack was the "only person out there." See *Hinton v. State*, 304 Ga. 605, 605-606 (820 SE2d 712) (2018) (concluding there was sufficient evidence to convict the defendant of criminal attempt to commit robbery when he was "lying in wait to rob someone" and ambushed the victim as

the victim arrived home). Further, Appellant admitted that when he reached Jack's car, he ordered Jack to give him money, stating, "Don't move, give me $25." Appellant's words indicate that he intended to rob Jack, using an implicit threat of force to intimidate him into complying with the demand. See *Boyd v. State*, 284 Ga. 46, 47-48 (663 SE2d 218) (2008) (concluding evidence was sufficient to convict the defendant of criminal attempt to commit robbery where he threatened to stab the victims and told them "not to move" and that "this store is fixing to be robbed"). Given this evidence, it is highly probable that any error in admitting Appellant's prior conviction did not contribute to the verdicts. See *Allen*, 310 Ga. at 415 (concluding that any error in admitting other-acts evidence under Rule 404 (b) was harmless considering other strong evidence of the defendant's guilt).

4.     Finally, Appellant contends that the trial court erred by failing to instruct the jury on accident. See OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no

19

criminal scheme or undertaking, intention, or criminal negligence."). Appellant asserts that the evidence showed that the shooting was unplanned and unanticipated, as Appellant did not approach Jack's car with a gun, and only shot Jack during a struggle for Jack's gun. Moreover, Appellant claims that the shooting did not occur because of a criminal undertaking or criminal negligence because Appellant did not steal any valuable items from Jack, except the Accu-Tek.[11] We disagree.

As an initial matter, "to authorize a jury charge, there must be slight evidence supporting the charge." *Munn v. State*, 313 Ga. 716, 722 (873 SE2d 166) (2022) (cleaned up). However, "when the evidence shows that a defendant acted with criminal intent, was engaged in a criminal scheme, or was criminally negligent, then the affirmative defense of accident is unavailable and a jury charge on accident is not warranted." *Wainwright v. State*, 305 Ga. 63, 71 (823 SE2d 749) (2019). Here, as noted above, the evidence showed that

---

[11] On appeal, Appellant concedes that he shot Jack using Jack's gun and stole the weapon. However, the jury found Appellant not guilty of robbery related to Jack's gun and felony murder predicated on that robbery count.

Appellant approached Jack, a 73-year-old man who was alone in a dark area of the parking lot, demanded money, wrested his gun away, and shot him when he did not comply. Because this evidence showed Appellant's criminal intent to rob and shoot Jack, the defense of accident was unavailable. Therefore, the trial court properly denied his request for a jury instruction on accident. See *Wainwright*, 305 Ga. at 71 ("Because the evidence presented at trial shows that [the defendant] intended to commit, and indeed was in the midst of committing, armed robbery and aggravated assault with a firearm when this alleged accidental discharge occurred, the trial court properly denied [the defendant's] request for a jury charge on accident." (cleaned up)).[12]

---

[12] We have assumed two trial court errors in Division 3 (admission of Appellant's prior conviction and the jury instruction on that evidence). Notwithstanding this, Appellant fails to make any argument as to how he was prejudiced by the cumulative effect of the alleged errors by the trial court. See *State v. Lane*, 308 Ga. 10, 18 (838 SE2d 808) (2020) ("A defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors." (cleaned up)). Nevertheless, even assuming that we must sua sponte apply cumulative-error analysis under *Lane*, any such claim by Appellant fails considering the overwhelming evidence of his guilt. See *Lofton v. State*, 309 Ga. 349, 367 (846 SE2d 57) (2020) (concluding that the "cumulative prejudicial

*Judgment affirmed. All the Justices concur.*

---

effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the strength of the properly admitted evidence of [the defendant's] guilt" (cleaned up)).