305 Ga. 585
FINAL COPY

S18A1158.  THE STATE v. SPRATLIN.

NAHMIAS, Presiding Justice.

Appellee DeJuan Spratlin was convicted of malice murder and a firearm offense in connection with the shooting death of Edward Cobb.  The trial court granted Spratlin a new trial, however, on the ground that his trial counsel provided ineffective assistance by failing to seek the exclusion of testimony and comments about his post-arrest silence.  The State appeals that ruling.  As explained below, we reverse the trial court's order.

1.    (a)    In March 2012, a DeKalb County grand jury indicted Spratlin and Isaiah Blackmon on charges of malice murder, felony murder, aggravated assault on Cobb, aggravated assault on Stanton Gilliam, and possession of a firearm during the commission of a felony.  Spratlin and Blackmon were tried together beginning on October 28, 2013.

The evidence presented at trial showed the following.[1]  According to

---

[1] Because this appeal requires us to evaluate the strength of the evidence of Spratlin's guilt, we do not describe the evidence in the light most favorable to the jury's verdicts.

Briana Abner, she called Blackmon on December 6, 2011, seeking to buy some marijuana. Blackmon told her to pick up Spratlin, who had no car, because Spratlin knew where to acquire the drugs. Spratlin called his former high school classmate Gilliam and arranged to purchase a pound of marijuana at Gilliam's house. Abner picked up Spratlin and drove to the house; on the way, Spratlin counted the $800 in cash that he was going to use to buy the drugs. When they arrived, Spratlin and Abner entered Gilliam's house and went with him to the kitchen. Abner saw the candy and snacks that Gilliam and his housemates kept there to sell to neighborhood children, and Spratlin bought Abner some candy. Spratlin then called Blackmon to give him directions to the house because Spratlin and Gilliam could not agree on a price for the marijuana. At this point, Abner left the house to go wait in her car.

According to Gilliam, he called his friend and neighbor Cobb to come over when Blackmon arrived because Gilliam felt uncomfortable about having to deal with two people when he had been expecting to be dealing with Spratlin alone. The men continued to negotiate, and after Cobb arrived, Blackmon agreed to pay Gilliam $1,025 and handed over the money. Blackmon then put the pound of marijuana in his coat, and the four men left the kitchen and headed

2

toward the front door. They passed through a front room with a pool table in the middle; Gilliam was behind Cobb on one side of the pool table, and Spratlin was behind Blackmon on the other side. Blackmon and Cobb reached the front door at the same time, but as Cobb started to open the door, Blackmon turned, took a gun out of his pocket, and said, "F\*\*k this s\*\*t, you know what it is, go ahead and give me everything." Gilliam threw the money onto the pool table near Spratlin, and Cobb began to struggle with Blackmon over the gun. Gilliam rushed over to help Cobb, but he heard a gunshot and backed away. Blackmon then shot Gilliam in the upper leg; Gilliam fell against a wall, and Blackmon shot him again in the back of the leg. Gilliam ran to a bedroom and hid in a closet, where he heard several more gunshots followed by the alarm system's tone signaling that the front door had been opened. Gilliam did not see Spratlin get involved in the fight between Blackmon and Cobb, did not see Spratlin with a gun, and did not see Spratlin take any money off the table.

Abner, who had been waiting in her car, testified that after she heard the gunshots, she started to drive away when she saw Spratlin run out of the house in a panic saying, "They're trying to rob me." Spratlin got into Abner's car and they drove away. Abner did not see Blackmon leave the house, and she never

saw Spratlin with a gun.

Gilliam's two housemates, Karalo Jackson and Rikeshia Andrews, had been asleep but woke at the sound of gunfire. Jackson found Cobb lying on the floor in the living room and called 911. Jackson and Andrews attempted to resuscitate Cobb, but he died from his gunshot wounds. Gilliam was taken to the hospital and recovered from his wounds. When the police searched the crime scene, they found a number of small bags of marijuana in a pair of Jackson's pants in his room. Gilliam later testified that Jackson took 22 bags of marijuana out of Cobb's pockets before the police arrived. Gilliam told the police that Spratlin and his associate had come over to purchase candy and then attempted to rob him. When shown a photographic lineup that included both Spratlin's photo and Blackmon's photo, Gilliam identified Spratlin (his former classmate) but was unable to identify Blackmon. Gilliam, Jackson, and Andrews did not tell the police that Spratlin and Blackmon had actually come over to buy marijuana, although they admitted it at trial.

Experts testified that Cobb had a grazing gunshot wound to the back of the head. He was shot through his arm and into his side by a .40-caliber bullet fired from close range. The fatal wounds were caused by two .38-caliber bullets fired

into his back; there was no evidence about the range from which those shots were fired. A bullet recovered from Gilliam's leg was .40-caliber. Five more bullets and eight cartridge cases — a mixture of .40-caliber and .38-caliber — were found at the house. A firearms expert determined that at least two guns had been fired during the incident, including a .40-caliber pistol and a .38 Special or .357 Magnum revolver (but not a 380); because some of the bullets and casings were fragments, it was possible that a 10mm pistol was also used. Gilliam, Jackson, and Andrews each testified that they had no guns in the house, and Gilliam testified that he and Cobb did not have any weapons and did not attempt to rob Spratlin and Blackmon. A few days after the shooting, Blackmon received text messages about two guns he was trying to sell — a .40-caliber and a 380.

Spratlin was tracked to Alabama, where — 16 days after the shooting — detectives found him with Blackmon and an unidentified woman. Both suspects fled when the plainclothes detectives approached. Spratlin ran across the street but was quickly apprehended; Blackmon was later found hiding a mile away. A few days after the men were arrested, Gilliam saw Blackmon's photo on a mugshot website for DeKalb County, where Blackmon was listed as being

5

charged with housing a fugitive. Gilliam called one of the detectives investigating the shooting and told him that "they had the shooter under the wrong charge." While in jail, Blackmon told his mother over the phone that he "gave the gun to someone to get rid of."

Neither defendant testified. Spratlin's primary theory of defense was mere presence. Spratlin's counsel acknowledged that Spratlin set up the drug deal, but argued that he was surprised by Blackmon's spontaneous decision to rob and shoot Gilliam and Cobb.

(b) During its case-in-chief, the State elicited testimony from three witnesses regarding Spratlin's pretrial silence. First, as mentioned above, Abner testified that after she heard the gunshots, Spratlin ran toward her car and said, "They're trying to rob me." The prosecutor then asked the following questions:

> Q. Ms. Abner, when DeJuan Spratlin jumped back in the car, did he ever tell you to call 911?
> A. No.
> Q. Did he ever tell you to drive to a police station so he could tell them what happened to him?
> A. No.

Second, a detective from the Birmingham Police Department ("the Alabama detective") testified that he located and arrested Spratlin in Alabama.

6

The prosecutor then asked the following questions:

> Q. Did you ask [Spratlin] if he wanted to make a statement?
> A. No ma'am.
> Q. Did he make a statement? Did he tell you anything?
> A. No ma'am.

Third, a detective from the DeKalb County Police Department ("the Georgia detective") testified that he traveled to Alabama to retrieve Spratlin and Blackmon after they were arrested. The prosecutor then asked the following questions:

> Q. Okay. And when you got there, did you have the occasion to interview anyone?
> A. Yes.
> Q. Who did you interview?
> A. I interviewed DeJuan Spratlin and Isaiah Blackmon.
> Q. And what, if anything, did either of them tell you?
> A. DeJuan refused to make a statement. When I interviewed Isaiah, I noticed that he seemed to be under the influence of something. So I did not continue with the interview, knowing that he was going to be coming back to DeKalb County.

Spratlin's counsel did not object to any of this testimony.

At the close of the State's case-in-chief, with the jury outside the courtroom, Spratlin moved for a directed verdict of acquittal. In response, the prosecutor argued that after the shooting, "[Spratlin] made no phone calls to the police. He didn't go to the police."

7

Closing arguments were not taken down by the court reporter. After the arguments concluded and a lunch break (and with the court reporter taking down the proceedings again), Spratlin's counsel made an objection and moved for a mistrial, asserting that the prosecutor had "made a reference of Mr. Spratlin not talking to the police at any point" during the State's rebuttal argument. The parties disagreed about exactly what the prosecutor had said, but the trial court indicated that the prosecutor should not have referred to Spratlin's "not making a statement to the police" and should not have said "anything about the defendant remaining silent." The court denied the mistrial motion, but added the following curative instruction to the jury charges:

> A defendant in a criminal case is under no duty to present any evidence tending to prove innocence and is not required to take the stand and testify in the case. Furthermore, let me add that a defendant is not required to make any statement to the police. If a defendant elects not to testify or if a defendant elects not to make any statement to the police, no inference hurtful, harmful, or adverse to the defendant shall be drawn by the jury, nor shall such fact be held against a defendant in any way.

On November 1, 2013, the jury found Spratlin guilty of all charges except the aggravated assault of Gilliam. The trial court sentenced Spratlin to serve life in prison for malice murder and a consecutive term of five years for the firearm

charge. The remaining convictions were vacated or merged.[2]

(c) Spratlin's trial counsel then filed a "Motion for New Trial and Motion to Correct and/or Complete the Record," which was amended in December 2014. The motion argued, among other things, that the trial transcript needed to be supplemented to include the prosecutor's comments on Spratlin's silence during closing arguments as well as counsel's objections to those comments. After holding an evidentiary hearing, the trial court denied Spratlin's motion in February 2015. As to supplementing the record, the court ruled that the transcript of the discussion about the motion for mistrial "aligns with the Court's memory of the State's rebuttal argument about Spratlin's refusal to talk to the police." The court added that although Spratlin's counsel asserted that the prosecutor had also said, "Why didn't [Spratlin] testify?" the court would have "certainly addressed any violation as blatant as [that] on the record."

Spratlin filed a notice of appeal, and the case was docketed in this Court in July 2015. However, Spratlin then obtained new counsel, who successfully

---

[2] The jury found Blackmon guilty of all charges except malice murder; this Court affirmed his convictions in Blackmon v. State, 302 Ga. 173 (805 SE2d 899) (2017), in which he raised claims not pertinent here.

9

moved this Court to remand the case to the trial court to allow him to raise a claim of ineffective assistance of trial counsel.

(d)     On remand, Spratlin filed an amended motion for new trial asserting that his trial counsel had rendered ineffective assistance by failing to seek the exclusion of testimony and prosecutorial comments about Spratlin's post-arrest silence. At an evidentiary hearing in June 2016, trial counsel explained that he did not object to Abner's testimony about Spratlin's pre-arrest silence because he did not believe it was improper. He said that he did not object to the Alabama detective's testimony because several of his objections had already been overruled and he did not want the jury to see him being overruled again.

Trial counsel acknowledged, however, that he could have objected to the testimony outside the jury's presence. When asked why he did not make a motion in limine to prevent any further testimony or comments about Spratlin's silence, trial counsel said that he did not consider that option because he had never filed such a motion "to basically tell the State to act appropriately" and "you don't anticipate a prosecutor or those types of statements being elicited on direct testimony." Finally, counsel said that he did not object to the Georgia detective's testimony about Spratlin's refusal to make a statement for the same

10

reasons that he did not object to the Alabama detective's testimony, although he did object to the State's closing argument comments, which were "directly in reference to" the Georgia detective's testimony.

At the hearing, Spratlin based his legal arguments on federal circuit court cases holding that, under certain circumstances, a prosecutor's comment on the defendant's pretrial silence violates the Fifth and Fourteenth Amendments to the United States Constitution. Rather than responding to those federal constitutional arguments, the State based its argument on Georgia cases applying the evidentiary rule this Court announced in an old Georgia Evidence Code case — Mallory v. State, 261 Ga. 625, 629-630 (409 SE2d 839) (1991), overruled on other grounds by Clark v. State, 271 Ga. 6, 9-10 (515 SE2d 155) (1999).

In February 2018, the trial court entered an order granting Spratlin a new trial. After ruling that Spratlin's trial counsel was not ineffective with respect to Abner's testimony — a ruling not at issue on appeal — the court held that trial counsel provided ineffective assistance by failing to object to the Alabama and Georgia detectives' testimony and failing to prevent the prosecutor's comments during closing arguments. The court rejected trial counsel's excuses

11

for not objecting to the detectives' testimony, explaining that "the Court remembers that upon hearing the detectives' testimony, it would have sustained an objection if counsel had raised one" and that "counsel always has the option of raising objections outside the presence of the jury." The court added that if trial counsel had objected to the testimony and had it excluded, the prosecutor would not have improperly commented on Spratlin's silence during closing argument. The court noted the curative instruction it gave the jury, but said nothing about its effect. The court concluded that Spratlin had established both deficient performance and prejudice under Strickland v. Washington, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984), and therefore ordered a new trial. The State then filed this appeal.

2.   As we have explained many times before:

> To establish that his trial counsel was constitutionally ineffective, [a defendant] must prove both deficient performance by counsel and resulting prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show that his lawyer's performance was deficient, [the defendant] must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and [the defendant] bears the burden of overcoming this presumption. Id. at 689. To carry this burden,

12

he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. See Humphrey v. Nance, 293 Ga. 189, 192 (744 SE2d 706) (2013). In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Reed v. State, 294 Ga. 877, 882 (757 SE2d 84) (2014).

Even when a defendant has proved that his counsel's performance was deficient in this constitutional sense, he also must prove prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." Harrington v. Richter, 562 U.S. 86, 104 (131 SCt 770, 178 LE2d 624) (2011) (citation and punctuation omitted). Rather, [the defendant] must demonstrate a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Davis v. State, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo. See Barrett v. State, 292 Ga. 160, 167 (733 SE2d 304) (2012). "In all, the burden of proving a denial of effective assistance of counsel is a heavy one," and Spratlin has failed to carry that burden. Davis, 299 Ga. at 183 (citation omitted).

(a) The State contends that Spratlin's trial counsel was not deficient in

13

failing to object to comments on Spratlin's silence based on the evidentiary rule

announced in Mallory. It is true, as the State argues, that Spratlin's trial counsel

would not have been deficient for failing to object to comments about Spratlin's

*pre-arrest* silence on that ground, because this Court has not yet decided

whether Mallory's rule applies to cases tried under Georgia's new Evidence

Code, which had taken effect when this case was tried in October 2013. See

Eller v. State, 303 Ga. 373, 384 (811 SE2d 299) (2018).[3] But the State's

argument misses the point entirely, because Mallory's state evidentiary rule was

crafted for prosecutorial comments on silence that are not already prohibited by

the federal Constitution — that is, silence before the defendant receives Miranda

warnings or is interrogated while in custody, after which point the United States

Supreme Court's decisions in Miranda and Doyle prohibit comment on his

silence. See Miranda v. Arizona, 384 U.S. 436, 468 n.37 (86 SCt 1602, 16

LE2d 694) (1966) ("[I]t is impermissible to penalize an individual for exercising

his Fifth Amendment privilege when he is under police custodial interrogation.

The prosecution may not, therefore, use at trial the fact that he stood mute or

---

[3] We have granted a petition for certiorari to address this question. See State v. Orr, Case No. S18G0994 (orally argued on January 23, 2019).

14

claimed his privilege in the face of accusation."); Doyle v. Ohio, 426 U.S. 610, 619 (96 SCt 2240, 49 LE2d 91) (1976) ("We hold that the use [even] for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."). See also Howard v. State, 237 Ga. 471, 473 (228 SE2d 860) (1976) (holding that Miranda prohibits comment on a defendant's silence when he is subjected to custodial interrogation, "whether or not he had been . . . informed [of his right to remain silent] via the Miranda warning").

In Fletcher v. Weir, 455 U.S. 603 (102 SCt 1309, 71 LE2d 490) (1982), however, the Supreme Court held that "[i]n the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." Id. at 607. The Fletcher Court added that "[a] State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." Id. This Court in Mallory seized on that caveat to announce an evidentiary rule that prohibits Georgia prosecutors from eliciting testimony or

15

otherwise commenting about a defendant's pre-arrest silence for impeachment or otherwise. See Mallory, 261 Ga. at 630 (announcing that "a comment [upon a defendant's silence or failure to come forward] will not be allowed even where the defendant has not received Miranda warnings and where he takes the stand in his own defense"); State v. Sims, 296 Ga. 465, 469 (769 SE2d 62) (2015) (describing Mallory as "focus[ing] on commentary on a defendant's conduct between the time of the crime and prior to arrest").

Thus, we properly consider the testimony and comments about Spratlin's post-arrest silence through the lens of the federal Constitution rather than Mallory. The Alabama detective arrested Spratlin, but the record does not indicate that the detective ever gave Spratlin the Miranda warnings, and it appears that the detective never conducted a custodial interrogation, because he specifically denied asking Spratlin to make a statement. Indeed, it appears that the Alabama detectives simply apprehended Spratlin and Blackmon on behalf of the DeKalb County police. Nor does the record indicate that Spratlin affirmatively invoked his right to silence after the Alabama detective arrested him, as opposed to merely saying nothing. See Berghuis v. Thompkins, 560 U.S. 370, 382 (130 SCt 2250, 176 LE2d 1098) (2010).

16

There appears to be no controlling precedent from the United States Supreme Court or a Georgia appellate court on whether this precise type of testimony is constitutionally prohibited — post-arrest, pre-Miranda warnings, without interrogation or an affirmative invocation of the right to silence, and offered in the State's case rather than only for impeachment. Neither party has identified such controlling authority, and the federal circuit courts appear to be split on the issue. Compare, e.g., United States v. Moore, 104 F3d 377, 384-389 (D.C. Cir. 1997), with, e.g., United States v. Rivera, 944 F2d 1563, 1567-1570 (11th Cir. 1991). Because the law on this point is not settled, Spratlin's trial counsel cannot be deemed deficient for not objecting to the Alabama detective's testimony. See Eller, 303 Ga. at 384 (explaining that counsel is not deficient for failing to object under an unsettled question of law). To the extent the trial court found deficient performance in this respect, the court erred.

The Georgia detective's testimony was clearly objectionable, however, because he was attempting to interrogate Spratlin in a custodial setting and Spratlin invoked his Fifth Amendment right to remain silent by "refus[ing] to make a statement." See Miranda, 384 U.S. at 468 n.37; Howard, 237 Ga. at 473. See also Davidson v. State, 304 Ga. 460, 468 (819 SE2d 452) (2018) ("Nothing

17

in <u>Miranda</u> suggests . . . that the right to remain silent in response to a custodial interrogation attaches only if, and when, law enforcement officers have read the <u>Miranda</u> warning."). But the Georgia detective made only a brief reference to Spratlin's post-arrest silence before explaining at greater length how he had to stop Blackmon's interview because Blackmon appeared intoxicated. Thus, an objection may have called the jury's attention to the passing mention of Spratlin's silence, while also leading to the exclusion of testimony showing Blackmon — on whom Spratlin was trying to cast full blame for the crimes — in a poor light. "Whether the potential upside of arguably objectionable testimony exceeds its downside is a question of trial strategy, and [Spratlin] has failed to show that his lawyer's strategy was patently unreasonable." <u>Young v. State</u>, 305 Ga. 92, 97 (823 SE2d 774) (2019). Accordingly, the trial court also erred to the extent it found Spratlin's trial counsel deficient in this respect.[4]

Trial counsel did perform deficiently, however, with respect to the prosecutor's comments during closing arguments. By that stage of the trial, it

---

[4] The trial court's assertion that "upon hearing the detectives' testimony, it would have sustained an objection if counsel had raised one" is not controlling. A competent lawyer is not required to make every objection that the court would sustain, and as discussed above, it is not clear that an objection to the Alabama detective's testimony on constitutional grounds would have been properly sustained.

was clear that the prosecutor wanted to refer to Spratlin's pretrial silence as being indicative of his guilt, and the record shows that trial counsel was concerned by that point about such improper comments. Spratlin's counsel could have sought to prevent reference to the Georgia detective's testimony by raising the issue with the court outside the presence of the jury before closing arguments began; at a minimum, counsel performed deficiently by not objecting immediately when the prosecutor referred in her rebuttal argument to Spratlin's not making a statement to the police — a comment that trial counsel acknowledged at the motion for new trial hearing related directly to the Georgia detective's testimony. Trial counsel's mistrial motion made after the arguments concluded (and after a lunch break) was untimely, even if the trial court considered it on the merits. See Cowart v. State, 294 Ga. 333, 337 (751 SE2d 399) (2013) ("Cowart's objection and motion for mistrial, made after the prosecutor's closing argument ended, were not timely, and he therefore failed to preserve this issue for appeal.").

(b) We turn to considering the effect of trial counsel's deficient performance on the result of Spratlin's trial. In addressing the Strickland prejudice issue, it is important to recognize that the trial court erroneously

19

included the Alabama and Georgia detectives' testimony in its prejudice analysis, whereas we have determined that Spratlin's counsel was deficient only with regard to the prosecutor's arguments referring to Spratlin's refusal to make a statement to the police. According to the existing trial record, those comments were improper and intentional, but they were neither extensive nor extended. Compare Cartwright v. Caldwell, 305 Ga. 371 (825 SE2d 168) (2019) (finding Strickland prejudice where trial counsel's deficient performance related to an issue on which the prosecutor elicited extensive testimony and then argued at length in closing).

Moreover, while the prosecutor improperly suggested to the jury that Spratlin had an obligation to tell his story to the police when the Georgia detective interviewed him, the impact of that argument was mitigated in two significant ways. First, the prosecutor's comments were somewhat cumulative, because the jury also heard about Spratlin's pre-trial silence through Abner's testimony that Spratlin did not seek to tell his story to the police right after emerging from Gilliam's house; that testimony was not challenged by Spratlin's *post*-arrest silence ineffective assistance claim and remains unchallenged on appeal.

20

Second, the trial court gave the jury a strong curative instruction, explaining that "a defendant is not required to make any statement to the police" and cautioning the jury that "if a defendant elects not to make any statement to the police, no inference hurtful, harmful, or adverse to the defendant shall be drawn by the jury, nor shall such fact be held against a defendant in any way." We ordinarily presume that jurors follow such instructions. See, e.g., Mangram v. State, 304 Ga. 213, 217 (817 SE2d 682) (2018). Indeed, although the trial court noted that the prosecutor's disputed comments were not as "blatant" as a comment on the defendant's failure to testify, we have held that even a comment of that more egregious sort can be cured by proper instruction. See, e.g., Lingerfelt v. State, 238 Ga. 355, 360-361 (233 SE2d 356) (1977).

Moreover, although the evidence against Spratlin was not as strong as in other cases in which we have held that similar comments on post-arrest silence were harmless or not prejudicial, see, e.g., Taylor v. State, 303 Ga. 583, 585-587 (814 SE2d 302) (2018), the evidence of Spratlin's guilt was not weak.[5] Spratlin

---

[5] We note in this respect that the State again misunderstands the pertinent law. The State argued to the trial court and argues in its brief here that because the evidence was *sufficient* to support Spratlin's convictions (as the trial court ruled in denying his first motion for new trial), he could not demonstrate Strickland *prejudice*. In evaluating whether the evidence presented at a trial was legally sufficient as a matter of due process, the court must view the evidence in the light most

21

set up the drug deal with Gilliam, and "[t]his Court and others have recognized that violence is inherent in the business of dealing illegal drugs." Hood v. State, 303 Ga. 420, 423 (811 SE2d 392) (2018). See also Davis v. State, 290 Ga. 757, 760-761 (725 SE2d 280) (2012) (explaining that drug dealing is foreseeably dangerous, because it is "not unusual in the drug trade" for parties in the transaction to be armed). Spratlin then called his associate Blackmon to join him at Gilliam's house.

The forensic evidence demonstrates that two different guns were used in the shooting, with the shots that struck Cobb in the arm and side from close range and Gilliam in the leg being fired by a .40-caliber pistol wielded by Blackmon and the two fatal shots fired into Cobb's back from a .38 Special or .357 Magnum from an unknown range. Although Gilliam and Abner testified

favorable to the jury's verdicts to determine if a rational jury could find the defendant guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). But that is not the way in which we evaluate the prejudice resulting from counsel's deficient performance, as our cases have clearly held. See Woodard v. State, 296 Ga. 803, 810 n.5 (771 SE2d 362) (2015) (explaining that if the Jackson standard applied to the analysis of harmless error or ineffective assistance prejudice, "then there would be harmful error or Strickland prejudice only in cases where the evidence was insufficient and the convictions [were] already reversible on due process grounds"). See also Walker v. State, 301 Ga. 482, 489 (801 SE2d 804) (2017); Kennebrew v. State, 299 Ga. 864, 873-874 (792 SE2d 695) (2016). Instead, we must "review the record de novo. In doing so, we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." Woodard, 296 Ga. at 810 n.5 (citation and punctuation omitted).

22

that they did not see Spratlin with a gun, Gilliam was hiding in a closet when the final shots were fired, and Abner saw Spratlin only before and after the shootings, when he could easily have concealed a weapon. Three witnesses testified that no guns were kept in the house, and a few days after the crimes, Blackmon was trying to sell two guns, one of a type used in the shooting.

Spratlin fled the crime scene with Abner and without Blackmon, but that is also how he and Blackmon had arrived there. Perhaps most inconsistent with Spratlin's claim that he was surprised by Blackmon's attack on Cobb and Gilliam and had nothing to do with it is the fact that he was found with Blackmon again 16 days later, not just coincidentally somewhere in the Atlanta area but hiding out together and then fleeing from the police more than 100 miles away in Birmingham. The jury was instructed on the concept of parties to a crime, see OCGA § 16-2-20, and it could draw the natural — and under these circumstances, strong – inference that Spratlin and Blackmon shared a common criminal intent based on their presence, companionship, and conduct with each other before, during, and after the crimes. See, e.g., Butts v. State, 297 Ga. 766, 770 (778 SE2d 205) (2015).

For these reasons, we conclude that there is not a reasonable probability

23

that, but for the limited deficient performance by Spratlin's trial counsel, the jury at his trial would have reached a different result.  See Strickland, 466 U.S. at 694.  We therefore reverse the trial court's order granting Spratlin a new trial.

Judgment reversed.  All the Justices concur, except Melton, C. J., who dissents.

Decided March 11, 2019 — Reconsideration denied March 27, 2019.

Murder. DeKalb Superior Court. Before Judge Coursey.

Sherry Boston, District Attorney, Lenny I. Krick, Anna G. Cross, Otobong U. Ekpo, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Gerard B. Kleinrock, for appellee.