NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 20, 2022

S22A0798. THOMAS v. THE STATE.

PETERSON, Presiding Justice.

Derrico Thomas appeals his convictions for malice murder and possession of a firearm during the commission of a felony, stemming from the shooting death of Orlando Young.[1] Thomas argues that (1)

---

[1] The crimes occurred on August 29, 2013. On March 14, 2014, a Fulton County grand jury returned an indictment charging Thomas with malice murder, two counts of felony murder (predicated on aggravated assault and possession of a firearm by a convicted felon), aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. At a March 2015 trial, a jury found Thomas guilty on all counts. The trial court sentenced Thomas to life in prison without the possibility of parole for malice murder, plus a suspended sentence of five years for possession of a firearm during the commission of a felony. The trial court purported to merge the remaining counts into the malice murder sentence; the felony murder counts in fact were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). On March 27, 2015, Thomas filed a motion for new trial, which was amended in May 2020, twice in November 2020, and in May 2021. Following a hearing, the trial court denied the motion in an order entered on February 16, 2022. As discussed further in Division 3, the trial court in its order agreed with the State that the court "needs to sentence Thomas on the charge of possession of a firearm by a convicted felon" and indicated it would do so in a future hearing. The following

the trial court erred in admitting evidence of a prior shooting and his aggravated battery conviction that flowed from it; and (2) he was deprived of his right to testify due to the ineffective assistance of counsel. We conclude that although the trial court erred in admitting the evidence of the prior shooting, it is highly probable that the error in admitting the evidence about the shooting did not contribute to the verdict. And we conclude that Thomas has not met his burden to show that trial counsel was constitutionally ineffective. We therefore affirm Thomas's convictions.

The evidence presented at trial showed that Thomas shot and killed Young at a Fulton County apartment complex on August 29, 2013. Earlier in the day, at an apartment in the complex where Thomas and Young sold drugs, Thomas and Young had argued after Thomas refused Young's request to provide free marijuana to a young woman named Brittany. Young put his gun under his arm and left the apartment.

---

day, Thomas filed a notice of appeal, and the case was docketed to this Court's April 2022 term and orally argued on June 23, 2022.

That night, Thomas was alone in the back of the apartment when Young returned home. Young handed his gun to another person before going alone toward the back of the apartment. Soon after, gunshots rang out from the back of the apartment. Thomas was seen emerging from the apartment holding a firearm. Young was found lying in the apartment with 12 gunshot wounds. A 911 call reporting the shooting was placed at 10:51 p.m. Young died of gunshot wounds to the head and torso.

1.     Thomas argues that the trial court erred in admitting evidence of a prior shooting by Thomas that resulted in his conviction for aggravated battery. We agree but conclude that this error was harmless.

The State filed a pretrial notice of its intent to present evidence of an April 2009 shooting by Thomas under OCGA § 24-4-404 (b) ("Rule 404 (b)"). Thomas objected, arguing that it was not relevant for a proper purpose because the defense would not claim self-defense, accident, or duress; for that matter, intent would simply not be an issue in the case. And even if the evidence were relevant,

3

Thomas argued, any probative value of the evidence would be substantially outweighed by its prejudice. The trial court ruled at the start of trial that the evidence was admissible to show intent, motive, and "possibly" absence of mistake or accident, depending on what was presented at trial.

During the trial, over renewed defense objections, the State presented testimony from Thomas's former girlfriend about the April 29, 2009, shooting of Eric Ellis. The former girlfriend, Laney McLester, was dating Ellis at the time of the shooting. According to that testimony, McLester had loaned Ellis her car, and Ellis called her, upset, to report that Thomas had taken the keys from him. Thomas called McLester about an hour later to report that he had shot Ellis. The jury heard from an officer who responded to the incident; he testified that he responded to a call about the shooting of Ellis at about 11:00 p.m., about a block away from the location where Young was shot years later. The jury also was informed that Thomas pleaded guilty to aggravated battery in February 2010, admitting that he had maliciously caused Ellis bodily injury by

4

rendering his legs useless, shattering his jaw, and puncturing his lung. Although the court initially gave a limiting instruction to the jury that it was to consider the other-acts evidence only to establish intent, motive, or absence of mistake or accident, in two later instructions, including during its closing charge, the court told the jury that it could consider the evidence only for intent or motive. On appeal, the State defends only intent and motive as possible bases for admission of the evidence.

Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but such evidence may be admissible for other purposes, including to prove intent and motive. See OCGA § 24-4-404 (b) (containing non-exhaustive list of permissible purposes); *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015) (Rule 404 (b) "is, on its face, an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence"). When the State seeks

5

to introduce other-acts evidence under Rule 404 (b), it must show that (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its unfair prejudice under OCGA § 24-4-403 ("Rule 403"); and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Jones v. State*, 301 Ga. 544, 545 (802 SE2d 234) (2017). We review the trial court's decision to admit Rule 404 (b) evidence for an abuse of discretion. See *Kirby v. State*, 304 Ga. 472, 479 (4) (819 SE2d 468) (2018). Here, we conclude that the trial court abused its discretion in admitting the other-acts evidence for the purposes of intent and motive, but that error was harmless.

(a) *Intent*

The trial court abused its discretion to the extent that it admitted the other-acts evidence for the purpose of showing intent. Thomas concedes that the other-acts evidence was *relevant* to the issue of intent. See *Olds v. State*, 299 Ga. 65, 72 (2) (786 SE2d 633) (2016) ("[E]vidence that an accused committed an intentional act

generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent, especially when the acts were committed close in time and in similar circumstances."). But Thomas argues that the probative value of the evidence for that purpose was substantially outweighed by unfair prejudice, and we agree.

As to the second Rule 404 (b) prong, in evaluating the probative value of other-acts evidence offered to prove intent, we consider the overall similarity between the other acts and the charged crimes, the other act's temporal remoteness, and the prosecutorial need for the evidence. See *Hood v. State*, 309 Ga. 493, 501 (2) (847 SE2d 172) (2020). Here, the other act and the charged crimes were somewhat similar in that both involved shooting the victim in the head and torso over a personal dispute and took place within a block of one another and at similar times of the evening. The shooting of Ellis took place less than four-and-a-half years prior to the shooting of Young, which is not so remote as to be lacking in evidentiary value, particularly given that it appears that Thomas was incarcerated for

a substantial portion of the time between the two shootings. See *Jones v. State*, 311 Ga. 455, 464 (3) (b) (ii) (858 SE2d 462) (2021). But, although the trial court accepted the State's characterization that each shooting involved "some type of dispute over a girl," that broadly stated connection is not a very meaningful similarity. See *Jackson v. State*, 306 Ga. 69, 77-78 (2) (b) (ii) (829 SE2d 142) (2019) (rejecting the State's "general" treatment of similarities between other-act evidence and the charged crime, and undertaking a "more careful and granular comparison of the two incidents").

Moreover, the State had little, if any, need for extrinsic evidence to show that Thomas had the intent to murder or assault Young. As the parties framed the issue for the jury, either Thomas shot Young 12 times intentionally with the requisite intent, or he did not shoot him at all; there was no suggestion in the case that Thomas shot Young in self-defense or, even more improbably, that the 12 shots were all fired by accident. Although the State emphasizes that Thomas appears to have requested, and received, a jury charge on mere presence, the defense did not argue to the jury

8

that Thomas was present for the shooting but did not have the requisite intent for conviction. Rather, the defense argued in closing that the State's witnesses were not credible and someone else killed Young, telling the jury, "[t]he issue is whether Derrico Thomas was there." Indeed, the State in its closing argument also framed the choice before the jury as whether to conclude that Thomas "murdered Orlando Young" or "he wasn't there."

Given the limited similarities and minimal prosecutorial need for the evidence, it had little probative value as to intent. And evidence that Thomas had previously committed a shooting that severely injured the victim certainly held considerable potential for unfair prejudice. Moreover, the prosecutor discussed the other-acts evidence in closing argument, highlighting the injuries that Ellis suffered as a result. And the jury does not appear to have learned what, if any, punishment Thomas received for that act, which may have "increased the risk that the jury would want to punish [him] for his past conduct, rather than only for the charged crimes." *Jackson*, 306 Ga. at 79-80 (2) (b) (ii) (concluding that unfair

9

prejudice from other-acts evidence substantially outweighed its minimal probative value where jury did not learn that the defendant had been prosecuted, admitted his guilt, and served a sentence for his other criminal act).[2] Accordingly, the other-acts evidence had substantially greater unfair prejudicial force than probative value. See *Kirby*, 304 Ga. at 486 (4) (a) (ii) (abuse of discretion to admit other-acts evidence to prove intent where "Appellant disputed that he was the killer, but not that [the victim] had been stabbed to death").

(b) *Motive*

Thomas's prior act was not at all relevant for the purpose of showing motive. To be admissible to prove motive, the other-acts evidence "must be logically relevant and necessary to prove something *other than the accused's propensity* to commit the crime

---

[2] An admitted exhibit showed that Thomas received a sentence of ten years, with seven to be served on probation, but it does not appear that the exhibit was published to the jury, and it was not sent back with the jury during deliberations. Moreover, given that the jury heard that Ellis was shot in April 2009, and that Thomas was living freely in the community at the time of Young's shooting in August 2013, the jury necessarily knew that Thomas could not have spent much more than four years in custody for the shooting of Ellis, a sentence the jury may have viewed as inadequate for such a violent offense.

charged." *Thompson v. State*, 302 Ga. 533, 540 (III) (807 SE2d 899) (2017) (citation and punctuation omitted; emphasis in original).

In denying Thomas's motion for new trial, the trial court concluded that the prior shooting was relevant to show motive because it showed Thomas's "willingness to resort to violence to resolve a petty squabble with another man about a woman — violence that would seem excessive and inappropriate to an ordinary person." But that "is a classic improper propensity argument" and "identif[ies] [Thomas's] motive to act in far too generic a fashion." *Kirby*, 304 Ga. at 487 (4) (b). The trial court abused its discretion in admitting the other-acts evidence.

(c)   *The error was harmless.*

The trial court's evidentiary error warrants reversal only if it was harmful. See *Morrell v. State*, 313 Ga. 247, 261 (2) (c) (869 SE2d 447) (2022) ("It is fundamental that harm as well as error must be shown for reversal.").

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial

11

> court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.

Id. (citation and punctuation omitted).

To be sure, the prior shooting was a serious, violent act. Undoubtedly, there was risk of prejudice and confusion of the issues that could be offset only by strong evidence of Thomas's guilt for the charged crimes. But although the case presents a close question, our de novo review of the record, viewing the evidence presented at trial as a reasonable juror would, leads us to conclude that the evidence of Thomas's guilt was sufficiently compelling that the error in admitting the evidence about the shooting of Ellis did not contribute to the verdict.

No witness claimed to have seen Thomas shoot Young, and the jury heard about the criminal history of most of the key witnesses for the State and their ongoing legal troubles when some of them were interviewed. But multiple witnesses clearly implicated Thomas as the shooter.

Andre Miller testified that Young had been agitated on the day

of the shooting, Young relaying that he had argued with Thomas when Thomas refused Young's request to provide marijuana to a young woman. Temisha Sykes testified that she spoke to Young on the phone on the night that he was killed, and he said he was arguing with Thomas "about a girl."[3] Deandre Thomas (no apparent relationship to Appellant) also testified about Young having argued with Appellant about his refusal to provide drugs to a young woman. Deandre Thomas testified that he was standing in the kitchen when

---

[3] Sykes initially was an uncooperative witness at trial, and the State was permitted to play an audio recording of a statement that she gave to a detective. Although the recording was admitted as an exhibit, when the record was submitted to this Court on appeal, the computer disk marked with the pertinent exhibit number contained a number of files, none of which were clearly marked as the recording that was admitted at trial, and many of which were inaccessible, apparently due to corruption of files. Attempts to obtain a usable version of the exhibit from the trial court were unsuccessful. In his brief on appeal, Thomas references the admission of this recording, stating that Sykes subsequently admitted in her testimony "that the information that she told law enforcement on the recording was truthful, specifically, that on the night of the shooting, she spoke with the deceased on the telephone and the deceased stated that he had an argument with Appellant about a girl." Given the apparently inculpatory nature of Sykes's pre-trial statement, Thomas does not rely on its substance to argue that his convictions should be reversed, however. Instead, Thomas cites other evidence — in the form of testimony by other witnesses — for the proposition that Young "was angry at Appellant and was angry for matters unrelated to Appellant." But any evidence that Young may have been angry for reasons unrelated to Appellant on the night he was killed does not change our conclusion that the admission of the other-acts evidence was harmless.

13

Young returned to the apartment, gave his gun to Logan Shearer, and proceeded to the back of the apartment, where Appellant was alone. Deandre Thomas testified that he then heard gunshots and saw Appellant emerge from the apartment carrying a gun. Although Shearer was an uncooperative witness at trial, claiming to recall little of what happened on the night of the shooting or what he told detectives, the jury heard portions of his recorded interview with law enforcement in which he said unequivocally that Thomas had shot Young. Shearer said in the portions of the interview played for the jury that Young gave him his gun and then was inside the apartment for about five minutes before Shearer heard shots. Shearer said he was standing outside of the back door of the apartment and knew that Thomas shot Young because Thomas "came out of there with a gun, a gun in his hand." Christopher Atkins testified that after hearing shots he saw Thomas run out of the apartment holding something, and that he told the police the object was a gun. Atkins testified that he had spoken with Thomas in jail, and Thomas complained that people were "snitching on him"

14

about the murder of Young. The jury also heard a portion of a recording of an interview in which Jarquevious Brown, an exceedingly uncooperative witness at trial who refused to answer many of the questions put to him and who recanted his statement, placed Thomas at the scene. Although these witnesses all had credibility problems, together their testimony largely presented the same basic story, providing a reasonable juror reason to believe that story despite the witnesses' credibility issues.

In addition to witness testimony, cell phone tower data was consistent with Thomas having shot Young. The records showed that Thomas's phone was on and near the scene of the crime shortly before Young was shot. Around the time that the shooting was reported via a 911 call and shortly thereafter, Thomas's phone was turned off or in airplane mode. The records showed that by the time Thomas's phone had reconnected to a cell phone tower, less than 20 minutes after the shooting, it had been moved away from the area. This evidence showed that not only had Thomas been on or near the scene when the shooting occurred — itself not very remarkable given

that he was in the area frequently — but that he left the area after the shooting and took steps to limit the traceability of his movements. Viewed together, the eyewitness testimony and cell phone tower evidence were strong evidence of guilt.

Moreover, the trial court instructed the jury that it could consider the other-acts evidence only for certain limited purposes and could not consider it as evidence that Thomas had a propensity for committing certain acts. As explained above, there were limited similarities between the other act and the charged crimes, and intent was not a significant issue of dispute, so it is highly probable that the other-act evidence had little effect on any juror as to the purposes for which the court instructed the jurors that the evidence could be considered. And we presume that the jury followed the instructions not to consider it for any other purpose. See *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020) (considering limiting instructions in concluding that any error in admission of other-act evidence was harmless, because "[w]e ordinarily presume that jurors follow their instructions"). "In [the] light of the strong

independent evidence of [Thomas]'s guilt and the trial court's thorough instructions limiting the jury's use of the other acts evidence, we conclude that it is highly probable that any error in the admission of the other acts evidence did not contribute to the guilty verdicts against [Thomas]." *Edwards v. State*, 308 Ga. 176, 184 (3) (839 SE2d 599) (2020) (concluding any error in admitting other-acts evidence was harmless where evidence of the defendant's guilt was strong and the trial court gave limiting instructions); see also *Jackson*, 306 Ga. at 81 (2) (concluding that error in admitting evidence of prior shooting was harmless, largely based on overall strength of the evidence of the defendant's guilt); *Manning v. State*, 303 Ga. 723, 726 (2) (814 SE2d 730) (2018) (concluding any error in admitting defendant's prior aggravated assault conviction was harmless given eyewitness testimony implicating the defendant in charged shooting).

2.     Thomas also argues that his waiver of his right to testify was not voluntarily made because his decision was the result of undue pressure from counsel that constituted ineffective assistance

17

when counsel explained to him during the trial that any testimony by Thomas would have to be offered in narrative form because counsel had concluded his testimony would be untruthful. We disagree that Thomas has proven that counsel was ineffective in this regard.

At the close of the State's evidence, the trial court asked Thomas whether he planned to testify, and Thomas responded that he did. Thomas's lead trial counsel then stated to the trial court that Thomas's desire to testify put counsel in "an ethical situation" such that Thomas may need to testify in narrative form. The trial court cleared the courtroom at defense counsel's request, and the trial court and defense counsel explained to Thomas that his attorney could not participate in presenting perjured testimony. After a meeting with his lead counsel, Thomas announced to the court that he had changed his mind and decided not to testify.

At the hearing on Thomas's motion for new trial, Thomas testified that his conversation with counsel at trial about testifying was "heated" and counsel told him, "I'm not going to do it." Based on

18

this conversation, Thomas said, he understood that if he decided to testify, he would lose lead counsel as his lawyer and be left with co-counsel; Thomas testified that when lead counsel introduced him to co-counsel, lead counsel told him "that it was [co-counsel's] first trial and he'd never been through this kind of situation." Thomas said that his decision not to testify was based on this understanding. Proffering what he would have told the jury if he had taken the stand, Thomas testified that he shot Young in self-defense.

Thomas's lead trial counsel testified at the hearing that, based on his prior conversations with Thomas, he was confident that Thomas would perjure himself if he testified. Counsel testified that, after Thomas announced that he wished to testify, counsel made a phone call to an unspecified person whom he consulted on his ethical obligations. Counsel said that he then had a private, "animated" conversation with Thomas in which counsel explained that he could not elicit perjured testimony, such that Thomas would need to testify in narrative form if he took the stand. Counsel testified that he also explained to Thomas that testifying would be at odds with

19

the strategy that the defense had employed at trial. Counsel said that he would not have intentionally suggested to Thomas that counsel would abandon Thomas mid-trial if he testified, while acknowledging that counsel may have said something that could be misinterpreted in this way.

The trial court denied the motion for new trial, concluding that "[t]here was no ineffective assistance of counsel, and Thomas was not deprived of any constitutional rights when he decided not to testify." The trial court found that lead "counsel did not intend to convey he was walking away from representation" and "appropriately attempted to balance his ethical duties to his client and to the trial court."

To prove his claim of ineffective assistance of counsel, Thomas must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Thomas's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "To show that his lawyer's performance was deficient, the defendant must demonstrate that the lawyer performed his

duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *State v. Spratlin*, 305 Ga. 585, 591 (2) (826 SE2d 36) (2019) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." See id.

Although a criminal defendant's constitutional right to testify on his or her own behalf at trial is a right that is "personal to the defendant," see *Thornton v. State*, 292 Ga. 796, 798 (2) (a) (741 SE2d 641) (2013), trial counsel has a duty to inform a defendant about this right, that the choice to testify is the defendant's to make, and about the implications of choosing to exercise this right, see *Thomas v. State*, 282 Ga. 894, 896 (2) (b) (655 SE2d 599) (2008). If a defendant decides to testify, counsel must accept that decision and call him to the stand. See *United States v. Teague*, 953 F2d 1525, 1532 (11th Cir. 1992).

Here, Thomas does not contend that trial counsel failed to meet

any of these obligations. Rather, he argues that counsel should have communicated more clearly to him that he would not lose his lead counsel if he chose to testify. But Thomas points to no evidence that lead counsel said something to him that reasonably could be construed as a communication that lead counsel *would* abandon him if he chose to testify. Although Thomas testified that counsel used the words, "I'm not going to do it," in context, this is better understood as an explanation that counsel would not present any testimony by Thomas in question-and-answer format. Even if we assume that a lawyer's failure to clear up a client's obvious misunderstanding about the right to testify can in some circumstances constitute constitutionally deficient performance, cf. *United States v. Hung Thien Ly*, 646 F3d 1307, 1317 (11th Cir. 2011) (trial court was required to correct pro se defendant's obvious misunderstanding regarding whether he could testify while representing himself), Thomas can point to no evidence, let alone a finding by the trial court, that it was apparent to counsel that Thomas thought lead counsel would abandon him if Thomas chose

22

to testify. All Thomas points to is his own post-trial testimony that *he* was confused on that point. But "[w]hen considering a claim of ineffective assistance of counsel, the reasonableness of counsel's performance is judged from counsel's perspective at the time." *McLaughlin v. Payne*, 295 Ga. 609, 612 (761 SE2d 289) (2014). Thomas has not met his burden to show that counsel performed deficiently.[4] His enumeration therefore fails, and we thus affirm his convictions.

3. The parties have brought a merger error to our attention. As noted in footnote 1, the trial court purported to merge the count charging Thomas with possession of a firearm by a convicted felon, on which the jury found Thomas guilty, into Thomas's sentence for malice murder. In responding to Thomas's motion for new trial, the State argued that this was error and asked the trial court to impose a sentence on the felon-in-possession count. In its order denying the

---

[4] We note that, at the motion-for-new-trial hearing, appellate counsel praised lead trial counsel, Maxwell Schardt, as a "great lawyer" who is "nothing but ethical and really a beacon to all of us in . . . the legal community[.]" Indeed, we commend lead trial counsel for being conscientious regarding his ethical obligations in this situation.

motion for new trial, the trial court agreed with the State that the court "needs to sentence Thomas on the charge of possession of a firearm by a convicted felon" and added that it "will address this issue separately and schedule a sentencing hearing for Defendant Thomas on this conviction." The record indicates that no such hearing took place before Thomas filed his notice of appeal the following day.[5] Thomas correctly acknowledges in his appellate brief to this Court that the count charging him with possession of a firearm by a convicted felon does not properly merge into malice murder. See *Atkinson v. State*, 301 Ga. 518, 521 (2) (801 SE2d 833) (2017). "Although we decline to exercise our discretion under these circumstances to correct the merger error, nothing in this opinion should be read to preclude the trial court from doing so upon return of the remittitur." *Marshall v. State*, 309 Ga. 698, 701 (2) (848 SE2d 389) (2020).

*Judgment affirmed. All the Justices concur.*

---

[5] The record also does not reflect any order from the trial court unmerging the felon-in-possession count such that the count would have remained pending below and defeated finality of the judgment.