NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 14, 2024

S24A0014. ISAAC v. THE STATE.

McMILLIAN, Justice.

Appellant Kenneth Maurice Isaac was convicted of malice murder, among other crimes, for the shooting death of Reginald Roberts.[1] On appeal, Isaac claims that his trial counsel rendered ineffective assistance by refusing to allow him to testify in his own

---

[1] Roberts was shot and killed on the night of April 19, 2014. On August 30, 2016, Isaac was indicted on five counts in relation to the shooting: (1) malice murder; (2) felony murder predicated on aggravated assault; (3) aggravated assault; (4) possession of a firearm during the commission of a felony; and (5) violation of the Street Gang Terrorism and Prevention Act. A jury trial took place October 3-7, and October 11, 2016, and the jury found Isaac guilty of all counts. On October 20, 2016, the trial court sentenced him to life in prison with the possibility of parole for malice murder (Count 1), five years in prison consecutive to Count 1 for the possession offense (Count 4), and ten years consecutive to Count 4 for the street gang offense (Count 5). The felony murder count (Count 2) was vacated by operation of law, and the aggravated assault count (Count 3) merged into malice murder. On October 26, 2016, Isaac filed a motion for new trial, which he amended on September 26, 2022. The trial court held a hearing on that motion on October 4, 2022, and denied it by order dated November 1, 2022. On November 28, 2022, Isaac timely filed a notice of appeal, which he amended on November 29 and again on June 14, 2023. This case was docketed to the term of court beginning in December 2023 and submitted for a decision on the briefs.

defense and that the trial court erred by declining to instruct the jury on impeachment of a witness through bias toward a party. For the reasons that follow, his claims fail, so we affirm.

1. The evidence at trial showed the following. On April 20, 2014, Roberts was found dead, nude from the waist down, in a wooded area connecting two apartment complexes, Kensington Manor and Southern Pines.

The previous day, April 19, Roberts and two others stole vehicles from an airport, including a newer-model, black Ford Mustang. According to his girlfriend Keneisha Williams, Roberts returned home that afternoon, and then left in the evening to exchange a silver gun in his possession for a black gun. Williams testified that in the days leading up to that evening, Roberts had tried to exchange his silver gun by meeting with "someone named Chad." Williams did not know who "Chad" was, but recounted from her conversations with Roberts that "Chad" lived with his aunt, and that before April 19, Roberts had gone to the aunt's apartment to find "Chad" but did not find him there. After Roberts left on the

evening of April 19, Williams did not see him again.

That evening, Kenyatte Stephenson, a resident of Kensington Manor, saw Roberts near her apartment talking with a man for about twenty minutes and appearing "mad." In the days prior to April 19, Roberts had called Stephenson a number of times looking for Isaac. The same evening, Stephenson also saw Isaac, whom she had known for a year by then, at her apartment. Isaac had a black gun that evening, and he left between 8:00 and 9:00 p.m. to go to his aunt's house in Southern Pines. Stephenson heard two gun shots that night, though she did not know what time she heard the shots.

The same night, Tiffany Farley, a resident of Southern Pines who had known Isaac for years, went with Isaac's girlfriend to a local bar. According to Farley, at about 11:30 p.m. or midnight, she saw Isaac at the bar, and he told her: "I got a body, and he is naked from the waist down in the cut" and "[y]ou will see, just wait until in the morning." At trial, Farley described the "cut" as an area that people traversed to go between Kensington Manor and Southern Pines.

The next day, April 20, Isaac attended a cookout with family

and friends, including his cousin Sequoia Isaac[2] and her brother Kenyara Bolton. According to Sequoia, Isaac told her at the cookout that he had shot Roberts twice in the head. Sequoia also saw Isaac "near" and "go into" a newer-model black Mustang. Bolton also saw Isaac standing next to a newer "black or gray" Mustang.

That same day, Quantavious Hurt, a teenager who often visited Kensington Manor and Southern Pines, discovered Roberts's body, buttocks exposed, in the "cut" between the two apartment complexes, and notified police. Hurt testified that in the days leading up to the discovery, Roberts had come to the apartments looking for Isaac and thought Isaac had his gun; Roberts went to Isaac's aunt's home and asked her about the gun. About three or four days after he found Roberts dead, Hurt also saw Isaac in a "purplish blackish" Mustang.

After Hurt notified police, law enforcement responded to the crime scene. Richard Bowen, a forensic death investigator, found a

---

[2] Since Sequoia and Isaac have the same surname, we refer to Sequoia by only her first name.

gunshot wound in Roberts's neck. Based in part on the undisturbed dirt near Roberts's body, Bowen concluded that Roberts was nude from the waist down when he was shot and that right after getting shot, he fell where he was later found. Dr. Gerald Thomas Gowitt, the medical examiner who performed an autopsy on Roberts, also noted the gunshot wound on the right side of his neck, and concluded that the bullet path was "right to left, front to back, and slightly downward" and that whoever had shot Roberts "couldn't have been behind him."

On May 4, 2014, law enforcement found the black Ford Mustang that Roberts had stolen. None of the latent prints they found on the car matched Isaac's fingerprints, but Dr. Torry Passmore, the expert in fingerprint examination and analysis who had compared Isaac's fingerprints with those on the car, testified that fingerprints on a car could be wiped or washed down. Another law enforcement officer also indicated that he and those who towed the car had to have touched it, that the location where he had found the car was "out in the elements," and that "it rain[ed] when the car

5

had gotten wet."

Also that May, law enforcement arrested and interviewed Isaac. The audio recordings of two interviews were admitted at trial and played for the jury. In the first interview, conducted on May 24, Isaac told police that at the time of Roberts's shooting, he was in Florida. But in the second interview, conducted on May 29, Isaac told police that on April 19, he went to the "cut" with Sequoia's boyfriend, Kenyatta Frazier,[3] and saw Frazier come out directly behind Roberts and fire at Roberts three times. In that interview, Isaac stated he had never been in a black Mustang.

Isaac also told police that he was a leader in the Bloods gang with about 170 members under him and indicated that he could

---

[3] At trial, Isaac's counsel suggested that Frazier and not Isaac killed Roberts, by drawing attention to evidence that: (1) Frazier told police that he had been upset with Roberts for stealing and selling his property and that he thought Roberts was becoming a "greedy man"; (2) Roberts, according to his girlfriend Williams, wanted to sell Frazier's gun since Frazier had sold Roberts's cars in the past; and (3) Williams told police that Frazier was the one who called Roberts on April 19 shortly before Roberts left home. Isaac's trial counsel also suggested when cross-examining a detective who had interviewed Frazier, that Frazier and Sequoia's romantic relationship influenced Sequoia's statements to police about Isaac.

order members to handle those who disrespected him. At trial, Investigator Wayne Pinckney, an expert in street gang investigations, testified that gang leaders maintain their leadership by commanding respect: gangs always respond to a "disrespectful situation," and members often talk about their crimes to instill fear and command an area. Investigator Pinckney testified that those who violate a gang's norms can be "discipline[d]" even by murder, and recalled Isaac speaking to him about being "in charge of" people who committed violations. Hurt, the teenager who had found Roberts's body—and who had spent time with Isaac and had often visited Kensington Manor and Southern Pines, sites for gang activity—testified that it was "kind of a violation" for Roberts to have asked Isaac's aunt about a gun, because, in Hurt's words, "you don't never actually go to somebody's house or any person house and say something about the gun or anything because that kind of could spook them or scare them[.]"

Having seen situations where criminals ordered victims to strip at gunpoint to humiliate them, Investigator Pinckney believed

7

that whoever killed Roberts likely sought to humiliate him and send a message, because Roberts was found naked from the waist down in a frequently used area and without signs of sexual abuse.

2. Isaac claims his trial counsel provided constitutionally ineffective assistance by preventing him from testifying. The record shows that after the State rested, the trial court told Isaac that he needed to decide whether to testify and took a ten-minute recess to give Isaac the chance to confer with his trial counsel on whether to testify. After the recess, counsel announced that she "had the opportunity to speak with" Isaac, and Isaac himself announced that he was not going to testify. The defense then presented its case and rested after calling two witnesses. However, at the motion for new trial hearing, counsel and Isaac each testified that after the defense presented its last witness and right before the defense rested, Isaac told counsel he wanted to testify and she told him "no." Isaac indicated that this exchange also occurred in the ten-minute recess right after the State rested. The trial court, in its order denying Isaac's motion for new trial, "decline[d] to credit the testimony of

8

[Isaac] or trial counsel" and stated that "[n]othing in the record indicates [Isaac] ever expressed any desire to testify." Yet on appeal, Isaac maintains that he expressed to counsel a desire to testify and she told him "no," and that by doing so, she provided constitutionally ineffective assistance.

To succeed on his ineffective assistance claim, Isaac must show that his trial counsel performed deficiently and that the deficiency prejudiced the defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To show deficiency, Isaac must show that counsel "performed [her] duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023). To show prejudice, Isaac "must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Rashad v. State*, 318 Ga. 199, 208 (3) (897 SE2d 760) (2024) (citation and punctuation omitted). "If [Isaac] fails to make a sufficient showing on one part of the *Strickland* test, we need not

9

address the other part." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022).

Isaac argues that counsel performed deficiently by telling him "no" after he asked to testify, because by doing so she thwarted the exercise of his constitutional rights. See *Thomas v. State*, 314 Ga. 681, 690 (2) (878 SE2d 493) (2022) ("If a defendant decides to testify, counsel must accept that decision and call him to the stand"); *Mobley v. State*, 264 Ga. 854, 856 (2) (452 SE2d 500) (1995) ("[A] criminal defendant has a constitutional right, based on Fifth and Sixth Amendment guarantees and due process considerations, to testify in his . . . own defense"). Isaac argues that we should presume counsel's refusal to let him testify prejudiced him because that refusal amounted to a "constructive denial of counsel," see *Turpin v. Curtis*, 278 Ga. 698, 699 (1) (606 SE2d 244) (2004), and that even if we do not presume prejudice, Isaac has met his burden of showing prejudice under *Strickland.* The State, in turn, suggests that the trial court, in its order denying Isaac's motion for new trial, implicitly made a finding that Isaac never even expressed a desire

10

to testify, so we should accept this finding by the trial court unless it is clearly erroneous. See *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

Assuming that Isaac asked counsel to testify and counsel told him "no,"[4] and that counsel performed deficiently by doing so, we conclude that Isaac failed to show that his counsel provided constitutionally ineffective assistance.

(a) Isaac first argues that rather than require him to show prejudice under *Strickland*, we should presume prejudice because this case falls into the "constructive denial of counsel" exception to *Strickland* that we described in *Turpin*, 278 Ga. at 699 (1) (identifying "constructive denial of counsel" as one of the "narrow range of circumstances" where we "apply a presumption" of prejudice "in evaluating the prejudice component of a claim of ineffective assistance"). This exception, we have held, applies "only when there [is] a breakdown in the adversarial process, such that

---

[4] Since we resolve Isaac's ineffective assistance claim on prejudice, we need not decide whether the trial court made a factual finding that Isaac never expressed a desire to testify or whether such a finding is clearly erroneous.

11

counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Wainwright v. State*, 305 Ga. 63, 68 (3) (823 SE2d 749) (2019).[5] And, we have held, for this exception to apply, counsel's failure must be "complete" and "occur throughout the

---

[5] Two cases decided by the United States Supreme Court form the legal background of the "constructive denial of counsel" exception to *Strickland*'s requirements. The first case is *Strickland* itself, which discussed "constructive denial of counsel" as an exception to its requirement that a defendant show prejudice to succeed on an ineffective assistance claim. As the *Strickland* Court explained, "[i]n certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. . . . Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." 466 U.S. at 692 (III) (B). The second case is *United States v. Cronic*, where the Court similarly discussed, in the context of the Sixth Amendment right to assistance of counsel, "circumstances . . . so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." See 466 U.S. 648, 658 (III) (104 SCt 2039, 80 LE2d 657) (1984).  Those circumstances, the Court explained, include when there is a "complete denial of counsel" (e.g., counsel is "totally absent"), or, when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." See id. at 658-59 (III) & n. 25.

Reading *Strickland* and *Cronic* together, we have held that "*Cronic*'s 'constructive denial of counsel' exception to the general *Strickland* standard is a narrow one that applies only when there [is] a breakdown in the adversarial process, such that counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Wainwright*, 305 Ga. at 68 (3) (citation and punctuation omitted); *Turpin*, 278 Ga. at 699 (1); *State v. Heath*, 277 Ga. 337, 338-39 (588 SE2d 738) (2003). In addition, we have held, "the *Cronic* [constructive denial of counsel] exception requires an attorney's failure to be complete and [ ] occur throughout the proceeding and not merely at specific points." *Wainwright*, 305 at 68 (3) (citation and punctuation omitted). See *Tepanca v. State*, 297 Ga. 47, 50-51 (6) (771 SE2d 879) (2015) (citation and punctuation omitted); *Turpin*, 278 Ga. at 699 (1).

12

proceeding and not merely at specific points." Id. (citation and punctuation omitted); *Turpin*, 278 Ga. at 699 (1). Isaac argues that by preventing him from testifying, counsel failed to subject the State's case to "meaningful adversarial testing," *Wainwright*, 305 Ga. at 68 (3) (citation and punctuation omitted), because the State relied primarily on Sequoia's and Farley's testimony that Isaac had confided in them about the murder, and had he testified, he would have rebutted their testimony.

But as we stated in *Turpin*—which Isaac cites and does not ask us to overrule—"Georgia appellate courts have consistently required that, where a defendant alleges that counsel rendered ineffective assistance by preventing him from testifying, he must *show* that this action *actually* prejudiced his defense." 278 Ga. at 700 (1) (emphasis added; citing cases from this Court and federal courts to support this proposition and stating "Georgia law in this regard is consistent with the overwhelming weight of federal and state authority"). Isaac does not point us to any authority, nor have we found any, in which counsel's failure to allow a defendant to testify amounts by itself to

13

the kind of constructive denial of counsel described in *Turpin*.[6] Thus, we do not presume prejudice based on the constructive-denial-of-prejudice exception to *Strickland* but instead assess whether Isaac showed prejudice under *Strickland*. See *Turpin*, 278 Ga. at 700 (1), 701 (2) (after declining to presume prejudice, assessing whether defendant showed prejudice under *Strickland*).

(b) We conclude that Isaac failed to show *Strickland* prejudice. To begin, Isaac was never asked at the motion for new trial hearing what he would have specifically testified had he gotten on the stand. See *Bell v. State*, 287 Ga. 670, 675 (3) (697 SE2d 793) (2010) (defendant did not show prejudice from trial counsel's failure to call two witnesses who allegedly could have offered exculpatory

---

[6] In any event, Isaac fails to show that by denying his requests to testify, counsel "entirely" failed to subject the State's case to meaningful adversarial testing and that the failure was "not merely at specific points." See *Wainwright*, 305 Ga. at 68 (3) (citation and punctuation omitted). Even without calling Isaac to testify, counsel, throughout the trial, cross-examined the State's witnesses, including Sequoia and Farley; direct-examined defense witnesses; and objected a multitude of times. See *Burrell v. State*, 301 Ga. 21, 23 (2) (799 SE2d 181) (2017) (appellant's allegations that counsel was ineffective at "specific points of his trial" such as by failing to object at several moments, did not meet *Cronic*'s "stringent standard" for presumptive prejudice).

14

evidence, in part because defendant "offered only speculation as to the possible testimony of one of the witnesses, and did not offer even speculation about the possible testimony of the other witness"). However, Isaac was asked questions about the shooting, and he denied shooting Roberts, telling Farley that "I got a body," or telling Sequoia that he had shot someone. Isaac also testified that Frazier and Roberts had "beef" between each other, and suggested that Sequoia lacked credibility because Frazier was the father of her children.

Even if we assume that Isaac would have testified at trial along the lines that he testified at the motion for new trial hearing, there is not a "reasonable probability" that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (III) (B). See id. ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

First, the evidence of Isaac's guilt is strong. Sequoia testified that Isaac told her he had shot Roberts twice in the head. Farley recounted that Isaac had told her the night of Roberts's shooting, "I

got a body, and he is naked from the waist down in the cut." Roberts stole a black Mustang shortly before his death, and after his death, at least three people including a defense witness spotted Isaac near or "go into" a black or dark-colored Mustang, while Isaac told police he had never been in a black Mustang. In addition, Isaac told conflicting stories after his arrest. In his first interview, Isaac told police that he was in Florida at the time of Roberts's shooting; this contradicted not only his second interview but also Farley and Stephenson's recollection of seeing Isaac on the night of April 19. Also, Isaac's account of seeing Frazier shoot Roberts from behind contradicted expert testimony that the shooter could not have shot Roberts from behind. And, no witness testified at trial to seeing Frazier near the crime scene on the night of April 19.

Second, even if Isaac testified at trial, as he did at the motion for new trial hearing, about Frazier's relationship with Sequoia and alleged "beef" with Roberts, such testimony would have been cumulative of other testimony and evidence presented at trial that could support the defense's theory that Frazier committed the

16

murder, including: defense trial counsel's cross-examination of a detective about Sequoia's potential bias in favor of Frazier; Williams' testimony on Frazier and Roberts's issues, including that Frazier had sold Roberts's cars in the past and that Roberts wanted to sell Frazier's gun to "get even"; and Isaac's second interview, played before the jury, which included his account of Frazier shooting Roberts.

Given the strong evidence of Isaac's guilt and the cumulative nature of his potential trial testimony, there is not a "reasonable probability" that had Isaac testified along the lines that he testified at the motion for new trial hearing, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (III) (B). See *Hood v. State*, 308 Ga. 784, 788-89 (2) (843 SE2d 555) (2020) (concluding there was no prejudice, because "given the strong evidence of [defendant's] guilt, it is not reasonably probable that the outcome of the trial would have been different even if [an uncalled witness] had testified at trial"); *Mitchell v. State*, 308 Ga. 1, 7 (2) (b) (838 SE2d 820) (2020) (no prejudice from counsel's failure to

17

introduce evidence, in part because evidence of defendant's guilt was already "very strong"); *Ivey v. State*, 305 Ga. 156, 162-63 (2) (d) (824 SE2d 242) (2019) (defense counsel's failure to present victim's toxicology report did not prejudice defendant in part because report "would have been cumulative of other evidence introduced at trial" and so defendant failed to show how admitting the report "would have changed the result of the trial").

3. Isaac also argues that the trial court erred by declining to instruct the jury on impeachment of a witness through bias toward a party. At the charge conference and again after the court charged the jury, defense trial counsel objected to the trial court not giving the jury a pattern charge on impeachment of a witness through bias toward a party.[7] The court declined to give the requested charge, but

---

[7] Specifically, Isaac argues that the trial court should have charged the jury the following:

> "1.31.40 Witness, Attacked (old Impeached) [ ] In determining the credibility of witnesses and any testimony by them in court, you may consider, where applicable, evidence offered to [(attack) (cast doubt upon) (challenge) the credibility [or] believability of] [cause you to disbelieve] any such witness. This would include evidence of: Bias toward a part[y]. Shown by "Bad Acts" (extrinsic evidence or cross-examination)—Specific instances of conduct of the witness

provided the pattern jury charge on the credibility of witnesses.[8]

Isaac argues that the court erred in doing so, contending that there was slight evidence supporting the requested charge on bias. See *Morris v. State*, 301 Ga. 702, 705 (2) (804 SE2d 42) (2017) ("To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." (citation and punctuation omitted)).

Pretermitting whether there was slight evidence supporting the charge on bias, we conclude that the trial court did not err in declining to give that charge. For the court to have erred in doing so,

---

(in question) that may relate to the witness's (in question's) bias toward a party. O.C.G.A. § 24-6-608 (b)."
See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.40 (4th ed., updated January 2024).

[8] The record shows that the trial court charged the jury on credibility of witnesses, as follows:
"Credibility of Witnesses[:] The jury must determine the credibility of the witnesses. In deciding this, you may consider all of the facts and circumstances of the case, including the witnesses' manner of testifying, their means and opportunity of knowing the facts about which they testify, the nature of the facts about which they testify, the probability or improbability of their testimony, their interest or lack of interest in the outcome of the case, and their personal credibility as you observe it."
See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.10 (4th ed., updated January 2024).

the charge declined must not have been "substantially covered by the charge actually given." *Taylor v. State*, 272 Ga. 744, 745 (1) (534 SE2d 67) (2000) (citation and punctuation omitted). Here, the trial court's charge on the credibility of witnesses already asked jurors to consider a witness's "interest or lack of interest in the outcome of the case," and thus substantially covered the declined charge on impeachment of a witness through bias toward a party. See *Foster v. State*, 294 Ga. 383, 386 (7) (754 SE2d 33) (2014) ("'[T]he trial court thoroughly instructed the jury that it was the arbiter of each witness's credibility and that it should give consideration to each witness's *interest or lack thereof in the outcome of the case*. This charge adequately covered the possible motive, interest, or *bias* of the State's witnesses.'" (emphasis added; citing *Lee v. State*, 281 Ga. 776, 777-78 (3) (642 SE2d 835) (2007)).

4. Finally, presuming only one deficiency and finding no other error by defense trial counsel or by the trial court, we conclude that to the extent Isaac argues there was cumulative prejudice entitling him to a new trial, that argument fails. See *Jackson v. State*, 317

Ga. 95, 106-07 (4) (891 SE2d 866) (2023) (assessing both claims of counsel deficiency and trial court error, and holding that "[t]o establish cumulative error, [an appellant] must show that . . . at least two errors were committed in the course of the trial"); *Woods v. State*, 312 Ga. 405, 410 (3) (a) n.7 (862 SE2d 526) (2021); *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020).

*Judgment affirmed. All the Justices concur.*