321 Ga. 511
FINAL COPY

S25A0511. JOHNSON v. THE STATE.

PETERSON, Chief Justice.

Tanaiveon Johnson appeals his convictions for felony murder and other offenses stemming from a gang-related shootout in which Johnson's friend Arraffi Williams was killed.[1] Johnson argues that (1) the trial court erred in reopening the evidence during jury

---

[1] The crimes occurred on September 13, 2017. On September 19, 2018, a Chatham County grand jury returned an indictment against six defendants, including Johnson. The indictment charged Johnson with two counts of felony murder (Counts 13 and 14, predicated on aggravated assault and violation of the Georgia Street Gang Terrorism and Prevention Act ("Gang Act"), respectively), aggravated assault of Ebony Matthews (Count 15), aggravated assault of Rodrick Matthews (Count 16), aggravated assault of Calvin Morris (Count 17), four counts of possession of a firearm during the commission of a felony (Counts 18-21), and nine counts of violation of the Gang Act (Counts 40-48). Counts 14, 19, and 40-48 were nolle prossed on the State's motion on the first day of trial. At an October 2021 jury trial at which Johnson was the lone defendant, a jury returned guilty verdicts on all counts before it. On November 12, 2021, the trial court sentenced Johnson to life in prison for felony murder plus a five-year probated sentence on one of the firearm counts; the trial court merged all other counts, and the State does not challenge the merger of any counts. Johnson filed a timely motion for new trial that was amended by appellate counsel in November 2023 and June 2024. Following a hearing, the trial court denied the motion in an order entered on August 5, 2024. Johnson filed a timely notice of appeal. The appeal was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

deliberations to allow the State to introduce a jail call that Johnson made after the State rested; (2) trial counsel was ineffective for pressuring Johnson not to testify; and (3) the trial court erred in its jury instruction. We conclude that (1) the trial court did not abuse its discretion in reopening the evidence; (2) Johnson has not met his burden to show he was prejudiced by any deficient performance by counsel regarding Johnson's right to testify; and (3) Johnson has not shown that any clear and obvious error in the jury charge probably affected the outcome of his case. We therefore affirm.

The evidence presented at trial may be summarized as follows.[2] On September 13, 2017, Savannah-Chatham County police found the dead body of Williams slumped over in the rear passenger seat of a tan Kia Soul parked on East 31st Street. Williams had been shot in the head, with the bullet going through the headrest, consistent with the bullet coming into the car through the back window. A

---

[2] Because Johnson does not challenge the sufficiency of the evidence as to his convictions, and because we resolve both a claim of ineffective assistance of counsel and a claim of plain trial court error in ways that implicate the strength of the State's case, we present the evidence as a reasonable juror would have viewed it instead of in the light most favorable to the verdicts.

surveillance camera from a home on East 40th Street in Chatham County on that date showed a tan Kia Soul pass by three pedestrians, before the car stopped at the curb and the three pedestrians appeared to react and run away. The video showed at least one occupant of the car emerging and possibly shooting, and one of the pedestrians turning back toward the car and apparently shooting in its direction, before the car drove off and everyone dispersed.

Ebony Matthews testified that she, her brother Rodrick Matthews, and Calvin Morris were the three pedestrians in the surveillance footage.[3] Ebony testified that she saw "Tay" exit the vehicle and begin shooting at them, with Morris returning fire. Ebony identified Johnson as "Tay" in a photo array. Ebony's mother testified that immediately after the shooting, Ebony told her that "Tay" was the shooter.

Morris was uncooperative with the State at trial, testifying that he knew Johnson from school and had not seen Johnson on the

---

[3] Rodrick died in an unrelated incident prior to trial.

scene. Police testified that Morris reported that he fired his gun in response to being fired upon and indicated that "Tanaiveon" was the one who shot at him, although he did not identify anyone when shown a photo array including Johnson. The jury was shown a redacted video of an interview of Morris, in which he said two people emerged from the car shooting, and he shot back; he said he thought "Tanaiveon" shot at him but was not sure.

The medical examiner testified that the shot that killed Williams was "not likely to have been a close-range" shot. In the car, police found a 9mm gun underneath Williams's right hand, and the gun had a fired shell casing that was not ejected, meaning that the gun fired a bullet before it jammed. Additional physical evidence was consistent with crossfire between Morris and at least one shooter standing outside of the car.

The State introduced evidence that Johnson was a member of a gang called Only The Mob, while Morris, Rodrick, and Ebony were 1100 Block Gang members. Social media evidence also indicated that the two gangs had a dispute three days before the shooting,

4

with Johnson's account posting, "F**k #1100 yeah dat way."

Johnson did not testify at trial. The State played for the jury an audio recording of Johnson's statements to police in which he acknowledged that he was present for the shooting but said that he was not in the car and pointed to someone else as the shooter. The State introduced a social media post and messages from an account that the State's lead investigator said was maintained by Johnson; the investigator testified that the post and messages indicated that Johnson had admitted to being present when Williams died and confirmed that he had been shooting. The State also introduced recorded jail calls, which an investigator told the jury demonstrated Johnson's efforts in the weeks before trial to dissuade Ebony from testifying. And while the jury was deliberating, the trial court permitted the State to reopen its case to admit another jail call recording in which a voice identified by an investigator as Johnson's is heard saying, "[W]e shot back to protect the car . . . my homeboy got killed."

1. Johnson argues that the trial court abused its discretion

in allowing the State to reopen its case. We disagree.

Less than two hours and 15 minutes after beginning deliberations, which started on a Friday, the jurors sent notes asking to review the surveillance video and asking about "the process" if they could not reach a unanimous decision. The court played the video twice and told the jury that it was "far too early" to discuss the jury's inability to reach a verdict and encouraged the jury to continue deliberating. After the jury had deliberated for about two more hours, shortly after 5:00 p.m., the court inquired with the jury foreman, who reported that the jury was "at an impasse." The trial court then recessed court for the weekend.

On Monday morning, while the jury continued its deliberations, the State filed a motion to reopen the evidence so that it could introduce evidence of a jail call purportedly made by Johnson, from a different inmate's account, to an unidentified person, after the State had rested its case. An investigator told the court that the call had been located that morning, after the investigator had been out of the office for most of Friday and over

6

the weekend. The investigator said that he had searched the call recording records for Johnson's name when he was in the office on Friday but found the call recording on Monday when he searched by other numbers that Johnson had called previously. The defense objected on the basis that the call could have been discovered earlier and the timing prevented an opportunity to prepare a defense around the evidence. Before the trial court ruled on the motion later that afternoon, the jury sent a note that it was "deadlocked, making no progress[.]" After hearing the evidence and argument from the parties, the trial court agreed to reopen the evidence, saying that "this is a truth-seeking enterprise" and that the State had tracked down the call "relatively quickly" given that it was made from an account other than Johnson's, saying that Johnson could not complain about the "late-breaking" nature of the evidence given that he had created it and taken steps to conceal it, and the trial court would not "hold the State to an instantaneous review standard[.]" But the trial court said that it would wait to reopen the evidence until the next day, so that the defense would have some time to

prepare. The court then sent the jury home for the day.

When the jury reconvened on Tuesday, the trial court told the jury that it would be hearing additional evidence. The trial court told the jury that "whatever weight" the jury gave the evidence was "up to you, the jury, to decide[.]" After eliciting the investigator's testimony about how he discovered the recording of the call, the State played for the jury a portion of the recording of the call.[4] On the recording, a voice identified by the investigator as Johnson's is heard saying, among other things:

> Listen now, we on camera. We on camera going up top, man. . . . But I tell them folks — I tell them folks we were trying to protect the car. . . . Yeah, me and (indiscernible) because we shot back to protect the car, cousin, my homeboy got killed . . . . [W]e on video. We on camera.

Given another opportunity to present evidence subsequent to the admission of this new recording, the defense declined. The parties then both gave additional closing arguments. In his closing argument, the prosecutor played part of the new recording again,

---

[4] On cross-examination of the investigator, the defense played the entire recording.

saying, "You just heard the Defendant admit that thing that he could never admit. He admitted he was shooting." The trial court then instructed the jury to deliberate further, reiterating some general instructions on various matters.[5] About an hour later, the jury reached unanimous guilty verdicts on all counts before it.

"It is well settled that the decision to reopen evidence is a matter that rests within the sound discretion of the trial court." *Walton v. State*, 303 Ga. 11, 16 (4) (810 SE2d 134) (2018). This discretion encompasses the ability to reopen evidence even after deliberations have begun. See *Gardner v. State*, 263 Ga. 197, 198 (2) (429 SE2d 657) (1993), overruled on other grounds by *Paul v. State*, 272 Ga. 845, 848-849 (3) (537 SE2d 58) (2000). Given concerns about ensuring finality, maintaining an orderly and predictable trial process, and not giving undue emphasis to particular evidence, "after deliberations have begun, the power to reopen a case for

---

[5] Although the jury the previous day had made a request to re-review recordings of interviews of Johnson and Morris, the trial court at this point instructed the jury to go back to deliberate "[f]or now," saying if the jury had "further questions about those issues later on," it could "bring them up."

additional proof must be exercised with utmost caution." *Walton*, 303 Ga. at 16 (4) (citation and punctuation omitted).

Here, we cannot say that the trial court abused its discretion under the circumstances, even considering the caution it was required to exercise given that deliberations already had begun. Although the trial court's decision to reopen the evidence upset the usual order of a trial, that ruling was driven by Johnson's decision to make inculpatory statements to someone who was not his lawyer, on a phone system that he knew was being recorded and monitored, after the State had rested its case. The additional evidence presented by the State was limited to a recording of, and testimony about, that phone call. The trial court specifically found that Johnson had taken steps to conceal the call and that the State had unearthed the call "relatively quickly," findings that are supported by the record, including evidence that Johnson had used another inmate's account to place the call. The trial court gave the defense time overnight to consider how to respond to the new evidence and an opportunity to introduce additional evidence and give additional

closing argument. And the trial court instructed the jury that it could give the new evidence whatever weight it chose. Under these circumstances, we conclude that the trial court did not abuse its discretion. See *Young v. State*, 291 Ga. 627, 630-631 (4) (732 SE2d 269) (2012) (no abuse of discretion to allow State to reopen its case and present the testimony of two witnesses whose statements previously had been provided to the defense and who were not taken into custody until after the State rested, where trial court found that State made reasonable efforts to locate them sooner and their testimony was not a surprise to the defendants).

2. Johnson next argues that trial counsel placed "undue pressure" on him not to testify that amounted to ineffective assistance of counsel. We disagree.

At the motion for new trial hearing, trial counsel testified that he was generally opposed to Johnson testifying given Johnson's "significant academic and developmental challenges" and "significant issues in terms of his vocabulary skills and his ability to communicate." Trial counsel testified that he and Johnson spoke for

two hours before the defense rested its case the first time, and Johnson decided not to testify. Once the issue of reopening the evidence arose, defense counsel said, he and Johnson went "round and round" about whether Johnson should testify to explain the new call, with counsel not in favor of it and Johnson "adamant" that he wanted to testify to explain the recording. Counsel testified that Johnson "never changed his mind" about wanting to testify but "acquiesced" to counsel's judgment. But counsel agreed that it was Johnson's decision to testify or not and said, "I didn't . . . make the ultimate decision for him[.]"

At the motion for new trial hearing, Johnson recalled discussing his right to testify with trial counsel before the defense rested the first time but also claimed not to know that he had a right to testify after the evidence was reopened, denying counsel ever told him that. Johnson said that after the jury began deliberating and the motion to reopen evidence was filed, he told counsel that he wanted to testify. Johnson said that he never changed his mind and that no one could have changed it. Regarding specifically what he

would have testified to at trial about the new recording, Johnson stated: "I was stating that my homeboy got killed. . . . When I say we shot back to protect the car — put it like this: I was stating my homeboy got killed. Shots were fired back and protect — we was trying to — somebody was trying to protect the car." He also said that had he testified at trial and been asked if he was shooting on the day that Williams was shot, he would have said no.

In denying Johnson's motion for new trial, the trial court credited trial counsel's testimony that he advised Johnson of his right to testify after the evidence was reopened. The trial court did not make a finding concerning whether trial counsel prevented Johnson from testifying, but instead found, even assuming that had happened, there was no showing of prejudice based on the strong evidence of Johnson's guilt (including the "devastating" new recording) and the fact that Johnson's proffered testimony at the motion-for-new-trial hearing was itself also incriminating and would not have negated the admissions on the jail call.

"Although a criminal defendant's constitutional right to testify

13

on his or her own behalf at trial is a right that is personal to the defendant, trial counsel has a duty to inform a defendant about this right, that the choice to testify is the defendant's to make, and about the implications of choosing to exercise this right." *Thomas v. State*, 314 Ga. 681, 690 (2) (878 SE2d 493) (2022) (citations and punctuation omitted). We generally have considered claims that defense counsel unduly pressured a defendant not to testify through the lens of a defendant's Sixth Amendment right to effective assistance of counsel. See, e.g., *Seabrooks v. State*, 306 Ga. 670, 673 (2) (c) (832 SE2d 847) (2019). And Johnson frames his claim in that way.

To prove a claim of ineffective assistance of counsel, Johnson must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Johnson's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "If [a defendant] fails to establish one of these two prongs, we need not examine the other." *Payne v. State*, 314 Ga. 322, 328 (3) (877 SE2d 202) (2022) (citation and punctuation omitted).

14

"To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. at 328-329 (3). "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 329 (3) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. at 329 (3) (citation and punctuation omitted).

Although Johnson argues that counsel placed "undue pressure" on him not to testify and that this amounted to deficient performance, effective representation may include strongly advising a client that testifying is not in the client's best interests. See *Seabrooks*, 306 Ga. at 673 (2) (c) (rejecting ineffectiveness claim that counsel "coerced" defendant not to testify, where counsel testified

15

that he advised defendant he would be "eviscerated" on cross-examination and his testimony would "guarantee us a loss"); *United States v. Teague*, 953 F2d 1525, 1533 (11th Cir. 1992) (en banc) ("[I]f counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify."). We cannot say that counsel's admittedly strong advice against Johnson testifying was objectively unreasonable, given his stated concern about Johnson's ability to communicate effectively. The basis for this concern was undisputed and borne out by the conflicting nature of Johnson's testimony, in which he said that "*we* shot back," before stating that he would have testified that he was *not* shooting on the day in question.

Additionally, even assuming (as the trial court did) that counsel *prevented* Johnson from testifying, Johnson has not shown prejudice from any such deficient performance. See *Isaac v. State*, 319 Ga. 25, 29-31 (2) (901 SE2d 535) (2024) (rejecting argument that prejudice from counsel's preventing defendant from testifying is presumed under constructive-denial-of-counsel exception to

16

*Strickland* framework).[6] Johnson does not dispute the strength of the State's case against him, which included two eyewitnesses implicating him as shooting in their direction, as well as incriminating social media posts and phone calls by Johnson himself. Indeed, on appeal, Johnson refers to the admission of the recording of his jail call when the State was permitted to reopen its case as "catastrophic" and "defense-negating." And, indeed, the recording was at odds with Johnson's defense to the extent that counsel argued that the State had not proven that Johnson was at the scene of the shooting and, if so, that he was one of the shooters.

Although Johnson argues in his brief that not testifying "deprived [him of] the ability to provide a self-defense claim or, at a

---

[6] Johnson on appeal suggests that preventing a defendant from testifying against his wishes is never harmless to his defense, quoting *Luce v. United States*, 469 U.S. 38 (105 SCt 460, 83 LE2d 443) (1984), to the effect that an "appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." Id. at 42. But *Luce* involved not an ineffective assistance of counsel claim, but the question of whether a defendant who does not testify at trial may seek review of a trial court ruling denying his motion in limine to forbid the use of a prior conviction to impeach his credibility. Thus, *Luce* does not stand for the proposition for which Johnson cites it. And, as noted above, this Court clearly held in *Isaac* that a defendant bringing an ineffective assistance of counsel claim premised on an allegation that counsel prevented the defendant from testifying must show prejudice.

minimum, a basis for a conviction on the lesser included offense of Voluntary Manslaughter[,]" his proffered testimony — that, had he testified at trial, he would have said that he did not shoot — was at odds with these theories. Johnson thus has not shown a reasonable probability that had he testified at trial, the result of the trial would have been different. Accordingly, he cannot prevail on his ineffective assistance of counsel claim. See *Isaac*, 319 Ga. at 32 (2) (b) (rejecting claim that counsel was ineffective because she prevented the defendant from testifying, as, even assuming the defendant would have testified at trial similarly to his motion-for-new-trial hearing testimony, the evidence of guilt was strong, and the hearing testimony was cumulative of other evidence presented at trial that could support the defense theory); see also *Gaston v. State*, 307 Ga. 634, 637-638 (2) (a) (837 SE2d 808) (2020) (explaining risks of presenting inconsistent defense theories, particularly a theory contradicted by the defendant's own account of events, in concluding that appellant had failed to establish that he was prejudiced by counsel's failure to request a jury instruction on a particular defense

18

theory).

3. Finally, Johnson argues that the trial court erred in its instructions to the jury as to proximate cause. Johnson has not preserved any such argument for ordinary appellate review and has not met his burden to show plain error.

Johnson's attorney requested a jury instruction on proximate cause that would have said, "Proximate cause determinations are generally left to you the jury to decide. What constitutes proximate cause is always to be determined on the facts of each case, based upon mixed considerations of logic, common sense, justice and policy." The final charge did not include this particular language or any other language about proximate cause specifically, although the court did include some instructions about the causation element of felony murder, including that causation is a question for the jury.

Johnson did not object to the charge as given. Therefore, his claim may be reviewed on appeal only for "plain error." OCGA § 17-8-58 (b). See also *State v. Kelly*, 290 Ga. 29, 31-32 (1) (718 SE2d 232) (2011) (establishing plain-error review for unpreserved jury

instruction claims). This Court applies the following test for determining whether there is plain error in jury instructions under OCGA § 17-8-58 (b):

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Kelly*, 290 Ga. at 33 (2) (a) (citation and punctuation omitted; emphasis in original). "The appellant has the burden of showing a clear or obvious error and further making an affirmative showing that the error probably did affect the outcome below." *DeMuro v. State*, 317 Ga. 155, 163 (2) (892 SE2d 31) (2023) (citation and punctuation omitted). If one prong of the plain error test is not satisfied, we need not address the other prongs of the test. See *Kelly*, 290 Ga. at 34 (2) (b) n.5. Satisfying this high standard "is difficult,

as it should be." Id. at 33 (2) (a) (citation and punctuation omitted).

Johnson's enumeration complains of the trial court "refusing" to give an instruction on proximate cause — presumably, his requested language that "[w]hat constitutes proximate cause is always to be determined on the facts of each case, based upon mixed considerations of logic, common sense, justice and policy." This language generally would be an accurate statement of law. See *Melancon v. State*, 319 Ga. 741, 751-752 (2) (b) (906 SE2d 725) (2024). But Johnson cites no authority that this language was required.

And even assuming the trial court made a clear or obvious error by failing to charge that the State was required to prove the victim's death was a "reasonably foreseeable" result of the defendant's criminal conduct, see *Melancon*, 319 Ga. at 751 (2) (b), a question we do not decide,[7] Johnson has not made an affirmative showing that

---

[7] See *Holloway v. State*, 320 Ga. 653, 662 (4) & n.4 (911 SE2d 543) (2025) (pretermitting whether failure to instruct on proximate cause as to felony murder was clear and obvious error in case involving an instruction about proving causation as to felony murder similar to that used here).

any such error probably affected the outcome of the trial. Johnson in his appellate brief says virtually nothing about how omitting any particular discussion of the concept of legal cause in the jury instructions affected the outcome of this case. Although Johnson argues that a proximate cause instruction was warranted given evidence that Williams was shot from the direction of Morris and Rodrick, that does not mean that a jury instructed specifically on the concept of proximate cause probably would have acquitted Johnson. If the jury concluded that Johnson had in fact shot at rival gang members based on a dispute between the two gangs, as theorized by the State at trial, it is unlikely that the jury would also have concluded that it was not reasonably foreseeable that one of the rival gang members would have returned fire and fatally shot a member of Johnson's entourage. See *Melancon*, 319 Ga. at 751 (2) (b) ("When an intervening act was a natural or probable consequence of the defendant's conduct, a finding of legal cause is not precluded."); *State v. Jackson*, 287 Ga. 646, 654 (3) (697 SE2d 757) (2010) (Imposing liability "for the reasonably foreseeable results of criminal

22

. . . conduct if there is no sufficient, independent, and unforeseen intervening cause . . . would include, at least in some factual scenarios, a deadly response against one of the perpetrators by the intended victim of a dangerous felony like burglary or armed robbery."). And if the jury had concluded that Johnson was not present, did not shoot, or did not shoot first, the theories suggested by the defense, that conclusion would not have implicated proximate cause issues at all. Thus, Johnson has not shown that the trial court's failure to instruct on the concept of proximate cause probably affected the outcome of his trial. See *Draughn v. State*, 311 Ga. 378, 388 (6) (858 SE2d 8) (2021) (claim of plain error in jury charge fails because appellant did not show that omission from charge affected outcome of trial, because theory behind omitted instruction was both at odds with defendant's argument at trial and contrary to substantial evidence presented); *Armstrong v. State*, 310 Ga. 598, 606 (4) (852 SE2d 824) (2020) (rejecting claim of plain error in jury charge where appellant "makes only conclusory arguments about

23

harm").[8]

*Judgment affirmed. Warren, P. J., and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ., concur.*

Decided May 6, 2025.

Murder. Chatham Superior Court. Before Judge Karpf.

*Mones Law Group, Stuart M. Mones*, for appellant.

*Shalena Cook Jones, District Attorney, Lyle Burnham II, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Senior Assistant Attorney General, Nicholas D. Nunn, Assistant Attorney General*, for appellee.

---

[8] We have assumed one instance of deficient performance on the part of trial counsel in allegedly preventing Johnson from testifying and one trial court instructional error, but we concluded that Johnson has not met his burden to show harm as to either. Johnson does not argue that this deficiency and error cumulatively resulted in prejudice, and we discern no apparent cumulative prejudice on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[E]ven in the evidentiary context, a defendant who wishes to take advantage of the [cumulative-error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").